T.C. Memo. 2015-21

UNITED STATES TAX COURT

SUSAN NA A.K.A. SUNG HWA NA, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25569-12.                    Filed February 11, 2015.

R determined a deficiency in income tax for P's 2008 taxable
year arising from P's alleged failure to report additional income from
her business. R also determined an I.R.C. sec. 6662(a) accuracy-
related penalty. R computed P's alleged unreported income on the
basis of a bank deposits analysis. P contends that she held funds in
the analyzed bank accounts as an agent or trustee for her supervisor
and that she acted as a mere conduit for payments to and by her
supervisor. P contends that deposits of these funds do not represent
income to her.

<u>Held</u>: P established by a preponderance of the evidence that
she received some of the deposits allegedly constituting unreported
income as an agent, trustee, and/or mere conduit, but she failed to
prove this theory for other deposits and must include these latter
deposits in income.

**[*2]**     <u>Held</u>, <u>further</u>, because R determined that P derived the deposits she must include in income from her conduct of a trade or business and because P failed to produce evidence to the contrary, this income is subject to self-employment tax under I.R.C. sec. 1401(a) and (b).

<u>Held</u>, <u>further</u>, P is liable for the I.R.C. sec. 6662(a) and (b)(1) negligence penalty.

<u>Howard S. Fisher</u>, for petitioner.

<u>Sameera Hasan</u> and <u>Michael K. Park</u>, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, <u>Judge</u>:  Respondent determined a Federal tax deficiency of $367,297 for petitioner's taxable year 2008 after concluding that petitioner had underreported her income.  Because respondent identified petitioner's business as the source of the unreported income, the determined deficiency consisted of both income and self-employment taxes.  Respondent also determined a section 6662(a)[1] accuracy-related penalty of $73,459.40.  The issues presented for decision are:

---

[1] All section references are to the Internal Revenue Code of 1986, as amended and in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

**[*3]**  (1) whether petitioner failed to report $1,013,769.61 of income for 2008;

(2) whether petitioner's 2008 unreported income, if any, is subject to self-employment tax under section 1401(a); and

(3) whether petitioner is liable for a section 6662(a) accuracy-related penalty with respect to any underpayment of income tax for her 2008 tax year.

## FINDINGS OF FACT[2]

Some of the facts have been stipulated and are so found.  When petitioner, Susan Na, filed her 2008 return and when she filed her petition, she lived in Los Angeles, California.  Ms. Na speaks Korean and has very limited English-language skills.[3]

---

[2]In their briefs, the parties propose some findings of fact on the basis of statements made during the trial by respondent's counsel, by the Court, and by Ms. Na outside of her testimony.  As counsel should be well aware, the Court may rely solely on the evidentiary record in making its findings of fact.  We disregard statements not formally in evidence.  See generally Rule 143.

[3]Although counsel for Ms. Na entered an appearance after the trial and represented her on brief, she appeared at trial pro se, accompanied by an interpreter, Don Row.  Respondent's counsel represented that Mr. Row holds a law degree and so sought to use a different interpreter, Jean Rhee, an Internal Revenue Service (IRS) revenue agent who is also fluent in Korean.  The Court permitted each party to use its own interpreter, with each interpreter offering a check on the accuracy of the other's translation.  In only two instances did either translator allege a mistranslation by the other.  One alleged mistranslation relates to a disputed fact and is addressed below.  See infra note 13.  The other was acknowledged and corrected.

**[*4]**   During 2008 Ms. Na worked at Artnouveau City USA, Inc. (Artnouveau). Doo Young Choi owned and operated Artnouveau and another company, Artmonde, LLC (Artmonde).  Artnouveau paid Ms. Na a specified amount monthly.  She performed services on the company's premises, and Mr. Choi established her working hours.  For tax purposes Artnouveau reported compensation paid to Ms. Na on Form 1099-MISC, Miscellaneous Income, which Mr. Choi delivered to her.

I.   Tax Return

Ms. Na timely filed her 2008 Form 1040, U.S. Individual Income Tax Return.  Patrick Chyun prepared that return.  Mr. Chyun, who holds bachelor of science degrees in both economics and accounting, has practiced as a certified public accountant (C.P.A.) since 1992.  At the time of trial in December 2013, he had been preparing Ms. Na's annual Federal income tax returns for more than 10 years.

Ms. Na's 2008 Federal income tax return reported her occupation as "real estate sales".  The appended Schedule C, Profit or Loss from Business, identified her "[p]rincipal business or profession" as "[o]ffices of real estate agents & brokers".  The return reported income from the following sources, in the following amounts:  (1) taxable interest income of $3,138, (2) gambling winnings of

[*5] $1,421,385, and (3) net business income of $65,236. In 10 or more years of preparing Ms. Na's annual tax returns Mr. Chyun never reported her receipt of any gambling winnings other than in 2008. In Mr. Chyun's experience Ms. Na never reported more than $100,000 of annual gross income other than in 2008.

A.    Interest Income

As reported on Schedule B, Interest and Ordinary Dividends, Ms. Na received taxable interest income from Hanmi Bank. During 2008 she held two accounts at Hanmi Bank (Hanmi Bank accounts), a checking account (account 0349) and a money market account (account 5289). The account agreements under which Ms. Na opened these accounts provided that she was their sole owner and that she alone had signature authority on them. Ms. Na had no other bank accounts in 2008.

B.    Gambling Winnings

Along with other documents necessary to prepare her 2008 tax return, Ms. Na presented Mr. Chyun with a series of Forms W-2G, Certain Gambling Winnings, from various Las Vegas and California casinos. Casinos issue these forms when a person wins more than $1,200 at one time. Mr. Chyun reported Ms. Na's 2008 gambling winnings as other income on line 21 of Form 1040. On

**[*6]** Schedule A, Itemized Deductions, Mr. Chyun deducted gambling losses equal to the reported winnings.[4]

### C.     Business Income

As part of Ms. Na's 2008 return, Mr. Chyun prepared Schedule C.  Because Ms. Na had received a Form 1099-MISC from Artnouveau, Mr. Chyun reported on Schedule C Ms. Na's gross receipts of $95,200, deducted her claimed expenses, and computed Ms. Na's net business income as $65,236.  Mr. Chyun transferred that figure to page 1 of Ms. Na's Form 1040.

## II.     Return Examination

In May 2010, IRS revenue agent M. Bolden (RA Bolden) began examining Ms. Na's 2008 tax return.  As part of her examination, RA Bolden prepared summaries and analyses of 2008 deposits into account 0349 and account 5289.

### A.     Deposits

RA Bolden computed total 2008 deposits into account 0349 and account 5289 as, respectively, $887,132 and $1,279,953.  RA Bolden's bank deposits

---

[4]Respondent did not disallow Ms. Na's claimed loss deduction in the notice of deficiency.  The additional gross income determined in the notice apparently has nothing whatsoever to do with Ms. Na's reported gambling income and losses.

[*7] analysis reflects that Ms. Na received these deposits from the following sources, in the following amounts:[5]

| Source[1] | Account 0349 | Account 5289 |
|---|---|---|
| Account 0349 | --- | $64,000.00 |
| Account 5289 | $370,000.00 | --- |
| Angie H. In | [2]1,900.00 | 14,070.00 |
| Artnouveau[3] | 284,224.99 | 292,947.27 |
| Cash[4] | 43,800.00 | 61,450.00 |
| Chase Auto Finance | --- | 47.98 |
| Chul and Shelly Kim | 4,500.00 | --- |
| Doo Young Choi | 44,245.83 | [5]737,195.00 |
| Eric and Mihwa Mekus | 1,000.00 | --- |
| Hanmi Bank | --- | [6]3,138.67 |
| JK Worldwide Enterprise | [5]7,000.00 | --- |
| Koram Consulting | 1,609.00 | --- |
| Lee Gi Cheol | 5,976.50 | --- |
| Newkoa, LLC | 100,000.00 | --- |
| Pixma, Inc. | [5]500.00 | --- |
| Prima Escrow | | 22,103.89 |

[5]RA Bolden analyzed only deposits into Ms. Na's accounts; if she computed totals by payor, respondent did not introduce these computations into evidence. The Court independently scrutinized the bank records introduced into evidence and computed the amounts of deposits by payor and debits by payee that appear in the following tables. We have provided in the Appendixes the spreadsheets that underpin those computations and that support our factual findings and legal conclusions.

| | | |
|---|---|---|
| **[*8]** Saehan Bank | --- | 85,000.00 |
| Sunmin Kim | 3,636.43 | --- |
| Unknown (2007 and 2009 deposits) | 18,727.00 | --- |
| Voyager Indemnity Insurance | 12.72 | --- |
| Total deposits | 887,132.47 | 1,279,952.81 |

[1]All deposits consisted of checks, with three exceptions. First, Lee Gi Cheol wired $5,976.50 to Ms. Na's checking account on July 3, 2008, and Mr. Choi wired $179,995 to her money market account on February 29, 2008. Second, the source "Cash" refers to cash deposits. And third, when transferring funds between her accounts, Ms. Na sometimes used an internal Hanmi Bank withdrawal slip or electronically transferred the money.

[2]When Ms. Na deposited a $500 check from Ms. In on May 16, 2008, she received $100 cash back, for a net deposit of $400. RA Bolden did not include the $100 cash in her calculation of Ms. Na's unreported income, so we likewise omit that amount here.

[3]Ms. Na deposited numerous checks from Artnouveau into her accounts. Many of these checks were made out to cash or had blank payee lines, but others were made out to Ms. Na. On each of Feb. 15, Mar. 27, Apr. 1, 15, and 30, May 15 and May 30, June 16, July 1, July 21, and Aug. 1, 2008, Ms. Na deposited a $1,500 check from Artnouveau. In nearly all instances, these checks were made out to her by name. On each of Aug. 15 and 29, Sept. 16 and 30, and Oct. 15 and 31, she deposited a $1,400 check from Artnouveau, made out to her. On each of Nov. 14 and 28, and Dec. 15 and 31, she deposited a $1,600 check from Artnouveau made out to her. These relatively regular payments are consistent with Ms. Na's testimony that she received a "salary" or "monthly basis at certain amount" from Artnouveau.

[4]One $3,000 cash deposit occurred in 2009, so RA Bolden classified this deposit as nontaxable. See infra p. 11.

[5]Ms. Na deposited a single, $500 check from Pixma, Inc., the payee line of which was blank, into account 0349 on July 10, 2008. That check bounced on July 11, 2008. Ms. Na deposited a single, $7,000 check from JK Worldwide Enterprise, Inc., the payee line of which was blank, into account 0349 on Apr. 2, 2008. The check bounced five days later. On Apr. 16, 2008, Ms. Na deposited a $9,900 check from Mr. Choi, written to cash, into account 5289. The following day, that check also bounced. RA Bolden nevertheless included these three deposits in calculating Ms. Na's unreported income.

[6]Hanmi Bank paid Ms. Na interest on her money market account on the last day of each month.

[*9] B. Debits

Ms. Na made payments from account 0349 and account 5289 by check, direct debit, wire transfer, or withdrawal slip to the following recipients, in the following aggregate amounts:

| Payee | Account 0349 | Account 5289 |
|---|---|---|
| Account 0349 | --- | $350,000.00 |
| Account 5289 | $58,000.00 | --- |
| Angie H. In | 1,500.00 | --- |
| Artmonde | --- | 100,000.00 |
| Artnouveau | 348,750.00 | 250,000.00 |
| Belle Collection | 30,000.00 | --- |
| Blank (payee illegible from stub) | 17,585.12 | --- |
| Cash (payee illegible from stub) | 19,609.83 | 372,000.00 |
| Chase | 3,262.75 | 1,977.76 |
| Computer On-Site Services | 1,350.00 | --- |
| Credit card (provider unknown) | 36,699.03 | 78,567.84 |
| Deluxe Check | 14.10 | --- |
| Downtown Motors | 10,000.00 | --- |
| Doo Young Choi | 79,577.00 | 115,000.00 |
| Eun Mi Kwon | 50,000.00 | --- |
| Gui Gui & Gu Gu | 21,000.00 | --- |
| Hampshire Place Apartments | 7,055.93 | --- |
| Han Som | 6,000.00 | --- |
| Hanmi Bank | 16,600.00 | 15,000.00 |

| | | |
|---|---:|---:|
| [*10] Helio | 178.96 | --- |
| Hyo Sang Kim | --- | 3,841.33 |
| International Watches | 10,000.00 | --- |
| Joon Ha Kim | 1,500.00 | --- |
| Kwang Ja Yoo | --- | 9,518.00 |
| L.A. Department of Water & Power | 69.62 | --- |
| Media Master | 306.93 | --- |
| Mega Diamonds[1] | 8,787.00 | --- |
| Mercedes Benz | 6,596.17 | --- |
| Onyx Diamonds | 13,500.00 | --- |
| Oscar Cervantes | 100.00 | --- |
| Pitney Bowes | 97.39 | --- |
| Richard Suh | --- | 5,000.00 |
| Saade Diamonds | 10,900.00 | --- |
| Safeco Insurance | 1,913.40 | --- |
| South Coast Helicopters | 3,562.50 | --- |
| Standard Parking | 615.00 | --- |
| T-Mobile | 623.71 | --- |
| Unknown[2] | 72,458.10 | 2,184.56 |
| Verizon Wireless | 565.70 | --- |
| Young Ran Lee | --- | 3,618.00 |
| Total payments[3] | 838,778.24 | 1,306,707.49 |

[1]Mega Diamonds Corp. cashed a check made out to "Cash".

[2]Because these debits appear on Ms. Na's monthly bank statements, but no canceled checks in evidence match with them, we cannot determine the payees' identities. The parties' joint exhibits include copies of many canceled checks from both of Ms. Na's accounts. At trial, Ms. Na offered Exhibit 16-P, which we admitted, and which included several additional canceled checks as well as

**[*11]** duplicates of others already in evidence. Collectively, however, the exhibits omit many checks listed on Ms. Na's 2008 bank statements.

[3]These totals exclude debits for returned checks and associated fees as well as miscellaneous fees that appear on Ms. Na's bank statements.

## C.     Income

In computing Ms. Na's income on the basis of the bank deposits analysis, RA Bolden reduced Ms. Na's gross receipts as follows:

|  | Account 0349 | Account 5289 |
| --- | --- | --- |
| Total deposits | $887,132 | $1,279,953 |
| Checks written to Artnouveau | (348,750) | (250,000) |
| Nontaxable deposits[1] | (22,227) | --- |
| Inter-account transfers | (370,000) | (64,000) |
| Interest income[2] | --- | (3,139) |
| Net deposits | 146,155 | 962,814 |

[1]Ms. Na deposited a $500 check dated Jan. 16, 2008, from Angie In; the memo line on the check indicates that the amount represented a loan. RA Bolden classified this amount as nontaxable. RA Bolden also classified as nontaxable deposits made in tax years 2007 and 2009 that appeared along with 2008 deposits on bank statements for January 2008 and January 2009 and so had been initially included in her 2008 total.

[2]Ms. Na properly reported this interest income on her 2008 return.

RA Bolden debited checks Ms. Na wrote to Artnouveau because RA Bolden (1) determined that Ms. Na worked for Artnouveau and thus had a business relationship with the company and (2) audited Artnouveau's return and determined that it had included these amounts in its 2008 income. RA Bolden did not audit

[*12] Mr. Choi's return because she was not able to find him.  RA Bolden did not audit Artmonde.

On the basis of the bank deposits analysis, RA Bolden calculated Ms. Na's 2008 gross receipts as $1,108,969.61 and concluded that Ms. Na had failed to report $1,013,769.61 of business income (unreported deposits).

III.   Deficiency Notice

Respondent mailed Ms. Na a notice of deficiency on July 12, 2012.[6]  In the notice, respondent determined a $1,013,769.61 adjustment to Ms. Na's reported 2008 income.  Because RA Bolden believed that Ms. Na worked for Artnouveau as a real estate agent and that she earned sales commissions, respondent classified the additional income as Schedule C gross receipts subject to self-employment tax. Respondent calculated deficiencies in income and self-employment taxes of, respectively, $334,969 and $32,328, for a total deficiency of $367,297.[7] Respondent also determined a section 6662(a) accuracy-related penalty of

_____

[6]On November 10, 2011, Ms. Na signed Form 872, Consent to Extend the Time to Assess Tax, extending the period for assessment as to her 2008 tax year to April 30, 2013.

[7]Respondent computed Ms. Na's 2008 income and self-employment tax liabilities as, respectively, $343,663 and $41,545.  On her 2008 tax return, Ms. Na computed and reported her income and self-employment tax liabilities as, respectively, $8,694 and $9,217.

**[\*13]** $73,459.40 on the basis of, in the alternative, negligence or disregard of rules and regulations, a substantial understatement of income tax, or a substantial valuation misstatement.

Ms. Na timely petitioned this Court on October 16, 2012, for redetermination of the deficiency and the penalty, and we tried her case on December 12, 2013.

OPINION

This case requires that we decide a narrow issue: The parties do not dispute the amounts deposited into Ms. Na's accounts or the expenditures made with them; they disagree only as to the source and consequent character (taxable or nontaxable) of these deposits. We must decide that issue on a spartan record, principally by judging the credibility of the non-English-speaking petitioner's brief trial testimony. The stakes are relatively high: We must redetermine Ms. Na's liability for tax and a penalty that cumulatively exceed her typical annual income by more than 300%. Because we have no reason to deem Ms. Na's testimony untruthful, because other evidence in the record corroborates that testimony, and because respondent offered no contrary evidence, we find, for the most part, for petitioner.

**[\*14]** I.    Underline{Burden of Proof}

As a general rule, the Commissioner's determination of a taxpayer's tax liability is presumed correct, and the taxpayer bears the burden of proving the determination improper. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Because of the difficulty inherent in proving a negative, a somewhat different rule applies where the Commissioner determines that a taxpayer received unreported income. Weimerskirch v. Commissioner, 596 F.2d 358, 361 (9th Cir. 1979), rev'g 67 T.C. 672 (1977).[8] In such cases, before the Commissioner may rely upon the presumption of correctness, he must, as a threshold matter, "offer some substantive evidence showing that the taxpayer received income from the charged activity." Id. at 360.

If the Commissioner provides a "minimal evidentiary foundation" for his determination, the burden of proof shifts to the taxpayer. Palmer v. United States, 116 F.3d 1309, 1312-1313 n.2 (9th Cir. 1997); accord Petzoldt v. Commissioner, 92 T.C. 661, 689 (1989). At this second stage, the taxpayer must endeavor to

---

[8]This Court "follow[s] a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone." Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). When she filed her petition, Ms. Na lived in California, a State within the jurisdiction of the Court of Appeals for the Ninth Circuit, so we will follow decisions of that court. See sec. 7482(b)(1)(A).

**[\*15]** rebut the presumption in favor of the Commissioner's determination "by establishing by a preponderance of the evidence that the deficiency determination is arbitrary or erroneous." Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985).

Ms. Na contends that respondent failed to satisfy his threshold burden. She relies on decisions of this Court and the Federal Courts of Appeals that she asserts require not merely evidence that a taxpayer received money or property but also evidence that the money or property (1) belonged to the taxpayer and (2) emanated from a taxable source.

First, Ms. Na cites Delaney v. Commissioner, 743 F.2d 670, 671-672 (9th Cir. 1984), aff'g T.C. Memo. 1982-666, in which the court held that the presumption of correctness applied because the taxpayers admitted their ownership "of the asset that * * * [wa]s the basis of the deficiency." Ms. Na also relies on Schad v. Commissioner, 87 T.C. 609, 618-620 (1986), aff'd without published opinion, 827 F.2d 774 (11th Cir. 1987), in which we held the Commissioner's threshold obligation satisfied by evidence showing that the taxpayer "had in his possession * * * cash in the amount of $174,679 which he * * * attempted to use in the purchase of marijuana." Ms. Na charges that here, in

[*16] contrast, she has not admitted, and respondent introduced no evidence to show, that she had an ownership interest in the funds deposited into her accounts.

Ms. Na's authorities do not support the distinction she attempts to draw. In Schad, we did not require the government to prove that the cash in the taxpayer's possession was his, or that he had attempted to buy marijuana for himself. Rather, the taxpayer's possession and attempted disposition of the funds sufficed to shift the burden to the taxpayer. See id. at 619-620. Schad also illustrates that the taxpayer need not admit an ownership interest in the asset that is the basis of the deficiency, as occurred in Delaney, for the Commissioner to satisfy his threshold burden.

Here, uncontroverted evidence establishes the amounts deposited into and expenses paid from account 0349 and account 5289. The parties have stipulated that these accounts were opened and operated pursuant to account agreements under which Ms. Na, and Ms. Na alone, owned the accounts and had signature authority on them. It is undisputed that Ms. Na held title to the Hanmi Bank accounts and disposed of funds in those accounts by writing checks to third parties. These facts constitute a "minimal evidentiary foundation" for respondent's determination that Ms. Na received unreported income. See Weimerskirch v. Commissioner, 596 F.2d at 361.

[*17] Second, Ms. Na points to <u>Weimerskirch v. Commissioner</u>, 596 F.2d at 361, in which the Court of Appeals faulted the Commissioner for failing to offer evidence "linking Weimerskirch to the sale of narcotics, or to the sale of heroin", the activities from which the Commissioner contended the taxpayer had received unreported income. See also <u>Rapp v. Commissioner</u>, 774 F.2d at 935 (defining the Commissioner's "initial burden" to require the introduction of "some evidence linking the taxpayer with income-producing activity"). Ms. Na asserts that respondent offered no evidence that she earned the moneys deposited into her account, such that they would be taxable to her as income.

Even assuming, arguendo, that respondent failed to tie the unreported deposits to any income-producing activity, this failure would not be fatal. "Congress specified no particular methods or evidentiary burdens on the Commissioner when choosing a method for reconstructing a taxpayer's income". <u>Palmer</u>, 116 F.3d at 1312. Rather, respondent may employ any reasonable method. See <u>Petzoldt v. Commissioner</u>, 92 T.C. at 693; <u>see also</u> <u>Palmer</u>, 116 F.3d at 1312 (method need only be "rationally based").

"The use of the bank deposits method for computing unreported income has long been sanctioned by the courts." <u>Clayton v. Commissioner</u>, 102 T.C. 632, 645 (1994); <u>accord</u> <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 867 (1991), <u>aff'd</u>, 959 F.2d

**[\*18]** 16 (2d Cir. 1992); see also Weimerskirch v. Commissioner, 596 F.2d at 362 (listing the taxpayer's bank deposits as one means by which the Commissioner could have attempted to substantiate the charge of unreported income). The method "assumes that all money deposited in a taxpayer's bank account during a given period constitutes taxable income." Clayton v. Commissioner, 102 T.C. at 645. The Commissioner must "take into account any nontaxable source or deductible expense of which * * * [he] has knowledge" but need not identify "a likely source of income". Id. at 645-646. "Bank deposits are prima facie evidence of income, * * * and the taxpayer has the burden of showing that the [Commissioner's] determination is incorrect". Id. at 645.

RA Bolden employed the bank deposits method to reconstruct Ms. Na's 2008 income. RA Bolden prepared schedules listing all checks, currency, and wire transfers deposited in account 0349 and account 5289. She eliminated all interaccount transfers and, to the extent of her knowledge, all deposits that Ms. Na had otherwise reported on her return, such as interest income paid by Hanmi Bank.[9] RA Bolden further reduced Ms. Na's total deposits for certain checks paid

---

[9]Ms. Na asserts that respondent failed to take into account a nontaxable source of other deposited funds--namely, Mr. Choi--and that respondent could have analyzed Mr. Choi's and his companies' bank accounts but chose not to do so. The record reflects that RA Bolden sought to audit Mr. Choi's return but was

(continued...)

**[\*19]** to Artnouveau, apparently concluding that these deposits were nontaxable to Ms. Na because Artnouveau included them in income. RA Bolden thus followed the precise steps we sanctioned in <u>Clayton</u> in reconstructing Ms. Na's income. This method was reasonable, and respondent was not obliged to offer proof of a likely source.

Because we conclude that RA Bolden's bank deposits analysis satisfied respondent's threshold evidentiary burden, respondent's determination of unreported income is entitled to the presumption of correctness. The burden of proof rests with Ms. Na.

---

[9](...continued) not able to find him. On brief, Ms. Na protests that respondent should have interviewed Mr. Choi in Korea, where respondent knew Mr. Choi was.

Our precedent does not require that respondent doggedly chase down every lead to exhaustion in an effort to eliminate receipts from nontaxable sources. <u>See</u> <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 872 (1991) (where the Commissioner used the bank deposits method to reconstruct income, noting that he was not obliged to "follow any 'leads' suggesting that * * * [the taxpayers] might have some deductible expenses"), <u>aff'd</u>, 959 F.2d 16 (2d Cir. 1992). We deem RA Bolden's efforts to find Mr. Choi rather cursory: She determined he was not in the United States on the basis of a single news article found through an Internet search. However, the parties advised the Court that Mr. Choi is not a U.S. resident for tax purposes, and there is no evidence in the record that Mr. Choi filed a 2008 U.S. Federal income tax return that RA Bolden could have audited.

[*20] II.     Unreported Income

The parties offer differing explanations of the source and nature of the unreported deposits into Ms. Na's accounts.  In respondent's version, the unreported deposits are taxable income from personal services Ms. Na rendered in conducting a real estate business.  In Ms. Na's version, the unreported deposits are nontaxable because the money was never hers; she received and disbursed the funds as an agent or trustee, or as a mere conduit, for Mr. Choi.  If we accept respondent's version of the facts, the unreported deposits constitute income.  If we accept Ms. Na's version, they do not.

A.     The Law

Section 61 defines gross income as "all income from whatever source derived".  Exclusions from this sweeping definition must be narrowly construed, Commissioner v. Schleier, 515 U.S. 323, 328 (1995), but "[i]t is well settled that the mere receipt and possession of money does not by itself constitute taxable income", Lashells' Estate v. Commissioner, 208 F.2d 430, 435 (6th Cir. 1953), aff'g in part, rev'g in part on other grounds and remanding 11 T.C.M. (CCH) 274 (1952).  In particular, the realization requirement circumscribes the broad scope of section 61 to "undeniable accessions to wealth * * * over which the taxpayer[]

**[\*21]** ha[s] complete dominion." <u>Commissioner v. Glenshaw Glass Co.</u>, 348 U.S. 426, 431 (1955).

Hence, if a taxpayer receives funds (1) subject to a "consensual recognition, express or implied, of an obligation to repay" them, or (2) subject to "restriction[s] as to their disposition", the funds may not constitute income to the taxpayer. <u>See</u> <u>James v. United States</u>, 366 U.S. 213, 219 (1961). In such cases, the taxpayer lacks "'actual command over the property taxed--the actual benefit for which the tax is paid'". <u>See</u> <u>id.</u> (quoting <u>Corliss v. Bowers</u>, 281 U.S. 376, 378 (1930)). Consequently, "[w]e accept as sound law the rule that a taxpayer need not treat as income moneys which he did not receive under a claim of right, which were not his to keep, and which he was required to transmit to someone else as a mere conduit." <u>Diamond v. Commissioner</u>, 56 T.C. 530, 541 (1971), <u>aff'd</u>, 492 F.2d 286 (7th Cir. 1974).[10]

_____

[10]The Commissioner has applied this rule in various factual contexts. <u>See,</u> <u>e.g.</u>, Rev. Rul. 67-47, 1967-1 C.B. 9, 10-11 (holding that, where a principal was obliged to repay "sums received \* \* \* from his exclusive sales agent as a security deposit to insure the agent's performance under the terms of a contract," provided that the agent so performed, the sums were not income to the principal); Rev. Rul. 65-282, 1965-2 C.B. 21 (holding that, where attorneys' contracts with a legal aid society obliged them to turn over all legal fees they received, they immediately turned payments over to the society, and they received no direct or indirect benefits from the fees, the fees were not income to the attorneys); Rev. Rul. 59-92, 1959-1 C.B. 11, 12 (holding that, where a pathologist received grant funds subject

(continued...)

**[*22]** Our Opinion in <u>Seven-Up Co. v. Commissioner</u>, 14 T.C. 965 (1950), illustrates this rule. There, bottlers that purchased the Seven-Up Co.'s syrup paid a $17.50 per gallon premium to cover the costs of a national advertising program administered by the company. <u>Id.</u> at 968-969. The Commissioner construed these payments as income to the Seven-Up Co., but after examining the facts and circumstances, including written and unwritten agreements among the parties, we reached the opposite conclusion. <u>Id.</u> at 977-979. We found determinative "the intention of all * * * parties concerned that these contributions * * * be used to acquire national advertising for the 7-Up bottled beverage and for that purpose only, and that * * * [the company] was to be a conduit for passing on the funds contributed to the advertising agency which was to arrange for and supply the national advertising." <u>Id.</u> at 977.

Consistent with these intentions, the Seven-Up Co. spent the premium payments on "national advertising, did not use them for general corporate purposes, treated the amounts on hand * * * on its books as a liability to the bottlers, and considered itself * * * merely as a trustee, handling the bottlers'

---

[10](...continued)
to the obligation to expend them for their earmarked purposes and derived no economic benefit from the funds, the funds were not income to the pathologist).

[*23] money." Id. at 978. Because the Seven-Up Co. had served as a mere conduit for the funds, the premium payments were not income. Id. at 979.

We addressed an important corollary to the "mere conduit" rule in Ford Dealers Adver. Fund, Inc. v. Commissioner, 55 T.C. 761 (1971), aff'd, 456 F.2d 255 (5th Cir. 1972). There, on facts very similar to those in Seven-Up Co., we held that the taxpayer, a corporation formed by Florida Ford dealers to unify and standardize their advertising and other promotional efforts, held as a trustee the funds it received from the dealers via the Ford Motor Co. and directly from the Ford Motor Co. Id. at 762, 764, 773. We explained:

> While it is true that strictly speaking the funneling of funds to Advertising is not the equivalent of the flow of water through a conduit, the utilization of this analogy shows that an intermediary may be employed as a depository for funds in trust which are destined for an ultimate use that is specified within defined limits. The benefit, profit, or gain is not to accrue to the intermediary but rather to some other entity. The fact that no benefit, profit, or gain accrues to Advertising as an entity along with the fact that a trust relationship does exist, is the primary reason for exclusion of the funds from gross income. * * * [Id. at 773-774.[11]]

---

[11]See also Florists' Transworld Delivery Ass'n v. Commissioner, 67 T.C. 333, 345-347 (1976) (excluding from income advances received from member florists that could be applied only for specified purposes, notwithstanding that portions were allocated to the taxpayer's overhead expenses); Mill v. Commissioner, 5 T.C. 691, 694 (1945) (excluding from income Moose Lodges' share of slot machine proceeds collected by the machines' operator and remitted to the State association on the individual lodges' behalf); Shaara v. Commissioner,

(continued...)

**[\*24]** In sum, our opinions teach that if a taxpayer receives and disburses funds strictly as an intermediary for transactions between other parties and receives no material benefit from the funds, the taxpayer need not include the funds in his or her gross income. Whether we should apply this rule to exclude from Ms. Na's gross income the unreported deposits into her Hanmi Bank accounts turns on the probative value and weight of her evidence concerning (1) her status as a mere intermediary and (2) her lack of benefit from the funds.

B.     The Evidence

At trial, Mr. Chyun and Ms. Na testified for petitioner, and RA Bolden testified for respondent. The parties entered into a stipulation of facts and concurrently stipulated 13 joint exhibits.

During her case in chief, Ms. Na offered, and we admitted, Exhibit 16-P, which consists of: (1) statements for and canceled checks written on the Hanmi Bank accounts during 2008, some but not all of which are duplicates of statements and checks already in evidence;[12] (2) a stub for the $100,000 check Ms. Na

---

[11](...continued)
T.C. Memo. 1980-247, 40 T.C.M. (CCH) 643, 646 (1980) (excluding from income kickback funds received as an intermediary in a public corruption scheme).

[12]Respondent's counsel confirmed that petitioner had shown her the exhibit before trial, and she represented that all of the checks and bank statements were

(continued...)

[*25] received from Newkoa, LLC, bearing a handwritten note; and (3) a schedule prepared by Ms. Na for trial which she contends summarizes the payments she made on behalf of Mr. Choi.

### 1. Ms. Na's Evidence

#### a. Ms. Na's Testimony

Ms. Na testified that Mr. Choi was her employer and that he prescribed her working hours and assigned her a desk in Artnouveau's offices. Ms. Na repeatedly emphasized that Mr. Choi, as her employer, instructed her to make certain deposits into her accounts and to write certain checks from her accounts. Ms. Na indicated that her financial situation was poor and that she felt she had to follow Mr. Choi's instructions to keep her job.

---

[12](...continued)
duplicative. Respondent assumes, on brief, that we excluded these documents in their entirety, but the transcript and the Court's records reflect that we declined to admit only two hearsay declarations originally submitted as part of the exhibit. We have since determined that some of the canceled checks in Exhibit 16-P, such as the $3,562.50 check dated January 29, 2008 and payable to the order of South Coast Helicopters, were not included in the joint exhibits, so we consider these checks along with Ms. Na's other bank records.

[*26] Ms. Na testified to how Mr. Choi used her accounts for deposits related to his business activities. For example, he told Newkoa, LLC, the counterparty on a refund option agreement, to make its $100,000 check payable to Ms. Na. Mr. Choi told Ms. Na to deposit the Newkoa check into her account and then "give it back", so she made the deposit and then "refund[ed] the money" to him. On another occasion, Mr. Choi gave Ms. Na funds to deposit and instructed her to then write a check to Artmonde.

Ms. Na also described how Mr. Choi directed outflows of money from her accounts. At Mr. Choi's direction, she paid vendors from whom he had purchased jewelry, rings, and other "expensive items". She also made payments on Mr. Choi's Mercedes Benz. Although Ms. Na does not like to gamble, on Mr. Choi's instructions she obtained a player's card and gave it to him to use. In addition to traveling with Mr. Choi on business trips with other employees, she accompanied him when he gambled. Mr. Choi spoke no English, whereas Ms. Na can speak limited, "casual language" in English, so she would sit beside him when he played.

[*27] Ms. Na would withdraw funds from her accounts for Mr. Choi's use during his gambling outings.[13]

---

[13]At respondent's counsel's request, Ms. Rhee rather than Mr. Row translated for Ms. Na when respondent's counsel cross-examined her. The following colloquy ensued:

Ms. Hasan   Did you use the funds in your accounts to gamble with Mr. Choi?

    \*    \*    \*    \*    \*    \*    \*

Ms. Rhee   She says it's true because he deposit [sic] his money to my account, her account. So I withdrew his money, which was in my account, withdrew that. And we gambled. But that was his money.

Mr. Row    No. That was wrong.

Ms. Hasan  Objection --

Mr. Row    No. No.

Ms. Hasan  -- Your Honor.

The Court   Wait. Wait.

Mr. Row    That was wrong translation. She never said, you know, "We gambled together." "He gambled himself."

[Mr. Row]   She said that's true, it's true. I did not gamble. He -- he gambles, I sit by him.

We substitute Mr. Row's name for Ms. Na's before the last-quoted statement even though the transcript attributes this statement to "Ms. Na" because (1) the court

(continued...)

**[\*28]**                     b.      <u>Ms. Na's Exhibit</u>

As part of Exhibit 16-P, Ms. Na provided a schedule summarizing amounts

she claims she paid from Mr. Choi's funds in her accounts at Mr. Choi's direction.

The schedule reflects total funds attributable to Mr. Choi of $1,011,502.80.

Ms. Na testified, and her schedule reflects, that she paid "back to" Mr. Choi

$361,000 from account 5289 and $290,964 from account 0349.  Pages 2 through

17 of Exhibit 16-P,[14] which are fastened together into two packets, consist of the

Newkoa check,[15] canceled checks deposited into or written on account 5289,

including checks written to Mr. Choi or to cash, and monthly statements for

---

[13](...continued)
reporter regularly used this convention throughout the transcript where Mr. Row translated into English statements Ms. Na made in Korean, and (2) the Court recalls hearing Mr. Row, not Ms. Na, make this statement.  Because Ms. Rhee did not defend her translation or contest Mr. Row's, the Court can only assume that she must have agreed she had erred.  We therefore do not construe Ms. Na's testimony as an admission to having gambled alongside Mr. Choi.

[14]As we have explained, <u>see</u> <u>supra</u> note 12, most of Exhibit 16-P duplicates matter already in the record.  Because some pages of Exhibit 16-P do not appear in other exhibits, however, and for consistency, we refer to page numbers within Exhibit 16-P only.

[15]The information printed on the back of the Newkoa check reflects that the check was deposited into account 0349 (not account 5289) on April 30, 2008.  Ms. Na's bank records do not disclose a corresponding $100,000 check or other debit from account 0349.  Ms. Na did withdraw $100,000 from account 5289 on October 24, 2008, but she did not identify this withdrawal on Exhibit 16-P as having been made on Mr. Choi's behalf.

[*29] account 5289 bearing, inter alia, annotations to the effect that Ms. Na made payments on Mr. Choi's credit card. The amounts total $361,000. Pages 29 through 51 of Exhibit 16-P consist of canceled checks written on and withdrawal slips for account 0349. Payees on the checks include Mr. Choi, Hanmi Bank, various jewelers, and "Downtown Motors". Other checks are written to cash. The amounts total $290,964.

Ms. Na further testified, and her schedule reflects, that she paid "back to" Artmonde $280,000 from account 5289. Pages 18 through 21 of Exhibit 16-P, which are stapled together, consist of two canceled checks written on account 5289 and monthly statements for account 5289, one of which lists the two canceled checks. One $100,000 check is payable to Artmonde, and the other $180,000 check is payable to "cash for wire".

Ms. Na testified, and her schedule reflects, that per Mr. Choi, she wired $16,977.81 to Korea from Account 5289. Pages 22 through 28 of Exhibit 16-P, which are stapled together, consist of: (1) two canceled checks from Prima Escrow, Inc., totaling $22,103.89; (2) a monthly statement for account 5289 reflecting those checks' deposit on September 5, 2008, and outgoing wires the same day totaling $16,977.33; (3) records of wire transfers to three individuals' bank accounts, at least one of which was held at a bank in Seoul, Korea, that

[*30] apparently correspond to the wires listed on the bank statement; and (4) a withdrawal slip for account 5289 dated September 5, 2008, for $6,000.

Finally, Ms. Na testified, and her schedule reflects, that per Mr. Choi she paid $62,560.99 of office expenses for Artnouveau from account 0349. Pages 52 through 84 of Exhibit 16-P consist of canceled checks written on account 0349 and monthly statements for account 0349 on which certain direct debit payments from the account have been highlighted. Payees on the checks include, inter alia, a computer services company, the Los Angeles Department of Water and Power, a parking company, and, on a single check on which the memo line reads "Rent", "Hampshire Place Apt". On many of the checks, however, the payee line is blank. Payees on the direct debits include, inter alia, mobile telecommunications service providers, "EQ Hampshire Pl", and one or more credit card providers. The check amounts and the highlighted debit amounts together total $54,753.72. The addition of two further, unhighlighted credit card payments listed on Ms. Na's account statements would bring the total to $62,560.99.[16]

---

[16]Exhibit-16P is not meticulously annotated or organized. In addition to the unhighlighted credit card payments that evidently constituted part of Ms. Na's total for office expenses, some payments to Verizon Wireless and EQ Hampshire Pl are highlighted, but others are not. Further, one of the payments Ms. Na identified as an office expense paid on Mr. Choi's behalf with his funds in the amount of $181.61 occurred in 2007. That payment cannot have been made with

(continued...)

[*31] In sum, Exhibit 16-P aligns with and provides granular detail for Ms. Na's version of events.  In her testimony, she claimed that many deposits into and debits from her Hanmi Bank accounts were attributable to Mr. Choi.  He either gave her money to deposit or directed third parties to remit to Ms. Na payments that were due to him or his companies; he then directed Ms. Na's disposition of those funds.  Exhibit 16-P purports to identify specific payments that Ms. Na made at Mr. Choi's direction, lending support to her trustee/conduit theory.  Testimony by Mr. Chyun, Ms. Na's longtime C.P.A., also lends credence to Ms. Na's story.

### c.    Mr. Chyun's Testimony

According to Mr. Chyun, during the more than 10 years in which he had prepared Ms. Na's Federal income tax returns, as previously noted, she had never reported more than $100,000 of annual gross income other than in 2008.  Nor, to Mr. Chyun's knowledge, had she ever received income from gambling winnings other than in 2008.  After Ms. Na gave him her Forms W-2G for 2008, he asked

---

[16](...continued)
funds Ms. Na received as a conduit for Mr. Choi during the 2008 tax year.
Considering that Ms. Na prepared the exhibit in the two-day period between the calendar call and trial, without assistance from counsel, we will not give disproportionate weight to these minor inconsistencies in her presentation.  Conversely, however, we will not speculatively treat as having been made on behalf of Mr. Choi deposits or payments other than those Ms. Na has specifically identified.  Hence, we will not classify the additional Verizon or EQ Hampshire Pl payments as conduit flows that would reduce Ms. Na's taxable income.

[*32] her about them because the total amount of the gambling income was "a kind of a very extraordinary number based on her prior tax return pattern." Ms. Na explained that the gambling winnings were "from her boss", who had asked Ms. Na to provide her own Social Security number to the casinos. According to Mr. Chyun, Ms. Na told him that Mr. Choi had pressured her, and that she felt she had no choice. The Court found Mr. Chyun's testimony credible and consistent with Ms. Na's version of events.

### d.     Ms. Na's Bank Records

Careful scrutiny of Ms. Na's bank records reveals a pattern consistent with Ms. Na's explanation for the unreported deposits. Coupled with her testimony, the records strongly suggest that Mr. Choi frequently funneled money through Ms. Na's accounts. Many deposits correlate with checks written contemporaneously with those deposits, for identical or nearly identical amounts. A large sum of money would flow in and then almost immediately flow back out. We offer a few examples to illustrate this pattern:

**[*33]**                                Account 0349

| Check date | Payor | Deposit amount | Check date | Payee | Debit amount |
|---|---|---|---|---|---|
| 1/5/2008 | Artnouveau | $20,000 | 1/5/2008 | Mr. Choi | $20,000 |
| 3/5/2008 | Artnouveau | 30,000 | 3/5/2008 | Belle Collection | 30,000 |
| 3/31/2008 | Artnouveau | 21,000 | 3/31/2008 | Gui Gui & Gu Gu | 21,000 |
| 5/20/2008 | Artnouveau | 10,000 | 5/20/2008 | Int'l Watches | 10,000 |
| 5/20/2008 | Artnouveau | 14,500 | 5/20/2008 | Onyx Diamonds | 13,500 |
| 8/11/2008 | Artnouveau | 6,600 | 8/11/2008 | Hanmi Bank | 6,600 |

Account 5289

| Deposit date | Payor | Deposit amount | Debit date | Payee | Debit amount |
|---|---|---|---|---|---|
| 1/7/2008 | Artnouveau | $30,000 | 1/8/2008 | Mr. Choi | $30,000 |
| 2/1/2008 | Artnouveau | 30,000 | 2/1/2008 | Cash | 20,000 |
| | | | 2/1/2008 | Cash | 10,000 |
| 2/15/2008 | Saehan Bank | 60,000 | | | |
| 2/19/2008 | Saehan Bank | 25,000 | 2/20/2008 | Mr. Choi | 85,000 |
| 2/29/2008 | Mr. Choi | 179,995 | 3/10/2008 | Cash for wire | 180,000 |
| 3/18/2008 | Artnouveau | 100,000 | 3/20/2008 | Artmonde | 100,000 |
| 4/16/2008 | Artnouveau | 5,000 | 4/16/2008 | Richard Suh | 5,000 |
| 10/24/2008 | Artnouveau | 8,000 | 10/24/2008 | Cash | 8,000 |
| 11/7/2008 | Mr. Choi | 15,000 | 11/7/2008 | Hanmi Bank | 15,000 |

[*34]     2.     Respondent's Evidence[17]

          a.     Exhibit 4-J

During her examination of Ms. Na's return, RA Bolden received a letter

dated May 16, 2011, and signed by Ms. Na.  In pertinent part, the body of the

letter reads as follows:

> I had large amounts of checks deposited into my 2008 checking
> account from, Artnouveau City USA, Inc, and Doo young Choi,
> major shareholder of Artnouveau City USA, Inc, however, all those
> deposits were withdrawn from his capital account from the Corp, and
> I either cashed the checks for him or we used the funds for gambling
> related expenses, such as seed money and travel expenses.

On its face the letter both supports and contradicts Ms. Na's testimony:   The letter

accords with her contention that many of the unreported deposits into her accounts

were of Mr. Choi's funds, but it suggests that along with Mr. Choi, Ms. Na made

use of those funds for gambling and travel.  To the extent of this latter suggestion

the letter undermines Ms. Na's credibility.

But although Ms. Na signed the letter, she testified that she did not write it.

Rather, she explained, Mr. Qua, whom she believed to be a former IRS revenue

---

[17]Exhibits 1-J, 2-J, and 7-J are, respectively, Ms. Na's 2008 Form 1040, her Form 872 for the same tax year, and the notice of deficiency.  Exhibits 3-J and 8-J through 13-J consist of RA Bolden's bank deposits analysis and the underlying bank records.  These exhibits speak for themselves, and we have integrated them into our findings of fact.  We will not revisit them here.

[*35] agent and who assisted her during some portion of the audit, wrote the letter at her request because of her poor English reading and writing skills.  On the basis of Ms. Na's evident difficulty with English, we find this explanation plausible. After Mr. Row translated the letter for her, Ms. Na protested that the pronoun "we" in the excerpted paragraph should be changed to "he"--a one-letter modification that would render the letter wholly consistent with Ms. Na's story. Especially considering that respondent's translator apparently may have mistranslated "he" as "we" during the trial, see supra note 13, we find it plausible that Mr. Qua made a similar error.

### b.     Exhibits 5-J and 6-J

Ms. Na signed account agreements with Hanmi Bank upon opening account 0349 and account 5289.  The agreements identify Ms. Na as the sole owner of and authorized signatory on the accounts.[18]  Artnouveau maintained its own bank accounts, as did Mr. Choi, so neither the company nor the owner had any obvious business need to funnel money through a worker's accounts.  However, neither the

---

[18]Handwritten annotations on the agreements, presumably made by a Hanmi Bank employee, reflect that account 5289 and account 0349 were closed in 2010, two years after the tax year at issue.  On a stamped line for "REASON", the handwritten annotations read "Moving Faraway" [sic] and "Not Used".  These facts bear no obvious relevance to Ms. Na's 2008 income, and as respondent made no attempt at trial or on brief to connect the dots, we will afford them little weight.

[*36] contents of the account agreements nor the fact that Artnouveau and Mr. Choi had separate bank accounts is at all inconsistent with Ms. Na's version of the facts.

### c. RA Bolden's Testimony

Respondent contends that Ms. Na was a licensed real estate agent who conducted business with and earned commissions through Artnouveau, and respondent offered RA Bolden's testimony to support this contention. After sketching the process she followed in her bank deposits analysis, RA Bolden testified that she had determined that Ms. Na "was in real estate sales" on the basis of Ms. Na's 2008 Schedule C and her initial interview with Ms. Na. RA Bolden's "understanding" was that Ms. Na "would get clients or people, investors, and try to make a transaction. And she collected the money sometimes. And then she would return the money to Artnouveau less her commission."

Although we found RA Bolden a credible witness, we cannot simply defer to her "understanding". Neither of the sources upon which that understanding was allegedly predicated renders it persuasive. Ms. Na's 2008 return identified her occupation as "real estate sales". The appended Schedule C reported her "[p]rincipal business or profession" as "[o]ffices of real estate agents & brokers". Mr. Chyun, not Ms. Na, prepared these documents. On cross-examination Mr.

[*37] Chyun affirmed that Schedule C says what it says, but respondent's counsel did not ask him to vouch for its accuracy or to describe Ms. Na's real estate activities in any greater detail.[19] Indeed, no other testimony or documentary evidence established Ms. Na's credentials or what she actually did at Artnouveau.[20] One may reasonably infer from the record that Artnouveau was a real estate agency, but Ms. Na could have been a secretary there as easily as a real estate agent.

To the extent that RA Bolden's conclusion rests upon her initial interview with Ms. Na, we can accord little weight to a factual conclusion arrived at through dialogue with a person of such limited English-language proficiency as Ms. Na. RA Bolden did not explain whether Ms. Na had expressly described her duties at Artnouveau. She did not state whether she had specifically asked Ms. Na about her activities during 2008, as opposed to the time of the audit. And she did not elaborate on the types of clients or investors Ms. Na allegedly secured or the types of transactions in which she encouraged them to engage. Absent any specifics

---

[19]Similarly, the parties stipulated that Ms. Na's "Schedule C business is real estate sales."

[20]Although during her opening statement respondent's counsel admitted ignorance as to Ms. Na's role at Artnouveau, respondent's counsel did not cross-examine Ms. Na about her job duties.

[*38] about the basis for RA Bolden's understanding or about what otherwise transpired during the interview, we find RA Bolden's testimony concerning Ms. Na's real estate activities to be of limited value.

In any event, even assuming that Ms. Na worked for Artnouveau as a real estate agent or broker and earned commissions in 2008, she would not necessarily have received additional income from this activity beyond that reported on her 2008 Schedule C. At most, respondent demonstrated a plausible source for the unreported deposits but offered no evidence linking the deposits to that source. Although this showing sufficed to satisfy respondent's threshold burden, and to place the burden of proof squarely on Ms. Na, see supra pp. 14-19, we do not find it highly probative when considered alongside other evidence. Moreover, we note that, according to Mr. Chyun, Ms. Na reported income of no more than $100,000 for prior years, and the record discloses no plausible explanation for the dramatic increase in earned income respondent determined for 2008.

C.    The Outcome

We decide this deficiency case on the preponderance of the evidence. See Bronstein v. Commissioner, 138 T.C. 382, 384 (2012).

**[\*39]**         1.         Weighing the Evidence

In unreported income cases such as this one, we and the Court of Appeals

for the Ninth Circuit have generally found against the taxpayer when the evidence

offered consists principally of the taxpayer's own testimony and that testimony is

either vague and improbable or uncorroborated by other evidence.  See, e.g.,

Delaney v. Commissioner, 743 F.2d at 672 (where taxpayers' case consisted solely

of taxpayer husband's testimony that assets allegedly representing unreported

income were purchased with posttax or tax-free income, holding that Tax Court

could properly reject testimony as "vague and implausible"); Geiger v.

Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971) (where taxpayer's evidence

consisted of her own testimony and that of her accountant, both highly general and

summary in nature, holding that Tax Court properly rejected the testimony), aff'g

T.C. Memo. 1969-159; Parks v. Commissioner, 94 T.C. 654, 659 (1990) (where

taxpayer's evidence consisted of her own, "incredible" testimony and the

contradictory and somewhat irrelevant testimony of a witness, rejecting the

testimony).

On the other hand, a taxpayer in an unreported income case need not

corroborate his own testimony to satisfy his burden of proof.  Potts, Davis & Co.

v. Commissioner, 431 F.2d 1222, 1225 (9th Cir. 1970) (where the only evidence in

**[\*40]** the record concerning a disputed factual issue was the testimony of two witnesses for the taxpayer, observing that "[t]he Tax Court is not * * * free to ignore the uncontroverted testimony" but "need not necessarily accept the uncontroverted testimony of the taxpayer" where such testimony was "almost wholly conclusory"), aff'g T.C. Memo. 1968-257.

Respondent asserts that Ms. Na's testimony was incredible and contends that Ms. Na offered no evidence beyond that testimony to prove she received the unreported deposits to her Hanmi Bank accounts as an informal agent or trustee or acted as a mere conduit for the funds. If that were true, we would not be obliged to accept Ms. Na's testimony as evidence probative of her theory. E.g., Geiger v. Commissioner, 440 F.2d at 689. Yet the record here does not support respondent's assertion.

We found Ms. Na's testimony remarkable, but not incredible. And crucially, other evidence in the record corroborates it: Mr. Chyun credibly testified to Ms. Na's history of reporting no more than $100,000 of income. He also testified to a conversation with Ms. Na, occurring at the time of the events

[*41] concerned, in which she provided the same explanation for her gambling winnings as the one she offered at trial.[21]

Exhibit 16-P elaborates, in detail, on Ms. Na's general testimony concerning her payments and withdrawals on Mr. Choi's behalf. Of course, income is at issue here, not deductions. Exhibit 16-P does not identify specific deposits that Ms. Na claims she received or accepted as a mere conduit for Mr. Choi. A conduit transaction involves two steps: a payment by the payor to the intermediary, and a payment by the intermediary to the payee. Ms. Na has offered evidence concerning only the second step.

Critically, however, her bank records reveal a striking pattern of matching deposits and withdrawals consistent with her story. For example, Ms. Na contends that she paid "back to" Artmonde $280,000 in the form of two checks: a $100,000 check payable to Artmonde, and a $180,000 check payable to "cash for wire". See

---

[21]Mr. Chyun testified on Ms. Na's behalf, not respondent's, and her prior, out-of-court statement was presumably offered for the truth of the matter asserted. Although, during her testimony, Ms. Na denied gambling with Mr. Choi, and respondent's counsel challenged the credibility of that denial, Ms. Na testified after Mr. Chyun, so her prior statement could not have been offered to rehabilitate her after respondent's counsel's attempted impeachment. Hence, Ms. Na's prior statement as recounted by Mr. Choi was hearsay. See Fed. R. Evid. 801(c), (d)(1)(B), (2). However, respondent's counsel did not object to the statement's admission and had a full and fair opportunity to cross-examine both Mr. Chyun and Ms. Na concerning it.

**[*42]** supra p. 29. Artmonde cashed the $100,000 check on March 20, 2008, two days after Ms. Na deposited a $100,000 check from Artnouveau. The $180,000 "cash for wire" check was cashed on March 10, 2008, 12 days after Ms. Na received a $179,995 wire transfer from Mr. Choi.

On the other side of the scales, the letter Mr. Qua drafted for Ms. Na is of little probative value given Mr. Chyun's testimony. That Artnouveau and Mr. Choi had their own bank accounts does not mean that they did not also use Ms. Na's. Moreover, Mr. Choi may have had a motive to use Ms. Na's accounts. Before trial, at the calendar call, Ms. Na asserted that Mr. Choi was not a U.S. person. Respondent unsuccessfully attempted to introduce evidence to this effect, so we assume that respondent agrees. No evidence on this point was admitted, but if Mr. Choi were a nonresident alien, he could potentially evade U.S. tax by funneling payments received from third parties and/or between himself and his companies through Ms. Na's accounts. Such an intent would be consistent with Mr. Choi's use of Ms. Na's Social Security number to obtain player's cards at casinos. Finally, RA Bolden's testimony, at most, proves that Ms. Na worked on commission as a real estate broker, but as explained supra pp. 36-38, we have good reason to doubt that this activity would produce income in the amount alleged by respondent.

**[\*43]** Finally, no evidence in the record reflects that Ms. Na derived any benefit from the funds she alleges she received, held, and disbursed for Mr. Choi.  For example, Ms. Na testified that the checks she wrote to various jewelers and for other "expensive items" were for Mr. Choi's shopping.  From the letter drafted by Mr. Qua and Ms. Na's correction of it, we infer that Ms. Na may have used cash withdrawn from her accounts to pay her own traveling expenses when she accompanied Mr. Choi on his gambling forays.  Given that she apparently viewed her role as Mr. Choi's casino translator as an employment duty, however, any benefit she realized was, at best, incidental.  See, e.g., Pierson v. Commissioner, T.C. Memo. 1976-281, 35 T.C.M. (CCH) 1256, 1259, 1261 (1976) (excluding from income kickback funds received as an intermediary in a public corruption scheme, notwithstanding that the taxpayer derived incidental benefit from enjoyment of his enhanced political status).

We conclude that evidence supporting Ms. Na's theory constitutes a preponderance of the evidence in the record.  Indeed, respondent offered no directly contrary evidence.  In Estate of Mason v. Commissioner, 64 T.C. 651, 659 (1975), aff'd, 566 F.2d 2 (6th Cir. 1977), the taxpayer explained bank deposits in excess of reported income as resulting from "his cashing of checks for, and making loans to, other persons and from check kiting."  We deemed him "not an

[*44] altogether forthright witness". Id. Nevertheless, because two other witnesses each partially corroborated his testimony and because scrutiny of his account records revealed a pattern of deposits and check payments consistent with check kiting, we "excluded from income any deposit that might, based on the available evidence, represent the proceeds of a kited check." Id. at 660-661. We think the quantum of evidence presented by Ms. Na analogous to that presented in Estate of Mason. Ms. Na was a forthright witness, one other witness partially corroborated her testimony, and analysis of her account records reveals a marked pattern consistent with her explanation. Accordingly, we will exclude from her income unreported deposits that, taking into account the available evidence, represent funds she received as a mere conduit or informal agent or trustee for Mr. Choi. See Ford Dealers Adver. Fund, Inc. v. Commissioner, 55 T.C. at 773-774.

2. Computing Unreported Income

Respondent determined unreported income of $1,013,769.61. Ms. Na attempted to show that she served as a conduit for payments totaling $1,011,502.80 in 2008. Ms. Na offered no evidence or argument concerning the remaining $2,266.81. We will make one addition and impose two reductions to the amount for which she did present evidence.

**[*45]** Beginning with the reductions, first, one of the payments identified in Exhibit 16-P, a $181.61 direct debit to T-Mobile, was made in December 2007 and thus cannot have been made as a conduit for funds deposited in 2008. See supra note 16. Hence, we will subtract this amount. Second, another item identified in Exhibit 16-P is not a payment, but a deposit. Ms. Na included the $100,000 check from Newkoa, LLC, that she deposited into account 0349 on April 30, 2008, among the items "paid back to" Mr. Choi from that account. Ms. Na did testify that she had received this deposit on Mr. Choi's behalf and remitted the funds to him, but she has not identified, and her bank records do not disclose, a corresponding outbound payment. See supra note 15. We thus can only speculate as to whether (1) Ms. Na "paid back" this $100,000 deposit separately from the conduit payments she identified on Exhibit 16-P, or (2) this $100,000 was included within the payments identified on Exhibit 16-P. To assume the former could result in double-counting of the $100,000 conduit flow and a consequent windfall to Ms. Na. To assume the latter could result in taxing Ms. Na on $100,000 of income that was not hers. Because Ms. Na bears the burden of proof, we will construe the deficiency in the evidence concerning this $100,000 deposit against her and subtract it from the total amount of conduit payments she computed.

[*46] We now turn to the addition to Ms. Na's computed amount.  The monthly statements for account 0349 reflect that, during 2008, Ms. Na paid a total of $6,596.17 to Mercedes Benz.  Ms. Na did not identify these debits as conduit payments in Exhibit 16-P.  However, after respondent's counsel highlighted these payments in her opening statement, Ms. Na testified:  "That was a payment I made for him.  He needs a car.  I made his car payment.  Not mine."  Given that Ms. Na tried her case pro se and prepared Exhibit 16-P in haste, see supra note 16, we give little weight to her omission of the Mercedes Benz payments from that exhibit in view of her emphatic, unequivocal, and uncontroverted testimony that the Mercedes respondent's counsel referenced was not hers.  On the basis of that testimony, we hold that the unreported deposits corresponding to these payments were not income to Ms. Na, and we will add $6,596.17 to her computation of conduit payments.

In addition to these three modifications to Ms. Na's computation of nonincome, we will make three reductions to respondent's computation of income. In computing Ms. Na's taxable income on the basis of her bank deposits analysis, RA Bolden included as income the face amounts of three checks that never cleared Ms. Na's accounts.  See supra p. 8.  Given that Ms. Na never actually received these funds, she could not have had "complete dominion" over them, see

[*47] Commissioner v. Glenshaw Glass Co., 348 U.S. at 431, and they do not represent income to her. We will thus overrule respondent's determination of unreported income to the extent of the sum of those three payments, $17,400.

Accordingly, we hold that Ms. Na has established by a preponderance of the evidence that she received $917,917.36 during 2008 as a conduit for Mr. Choi. We further hold that she must include $78,452.25 in income, and we sustain respondent's determination to that extent.

III. Self-Employment Tax

Section 1401(a) imposes a tax in addition to income tax "on the self-employment income of every individual". Section 1402(b) defines self-employment income as the "net earnings from self-employment" in excess of the Social Security contribution and benefit base, less any wages received during the tax year. In turn, net earnings from self-employment "means the [net] * * * income derived by an individual from any trade or business carried on by such individual". Sec. 1402(a).

Respondent determined that Ms. Na earned additional income from the conduct of a real estate sales business. On brief, Ms. Na contends that she earned no income from real estate sales during 2008, worked only as a secretary, and held funds as a bailee for Mr. Choi. She failed to prove her bailee theory with respect

**[\*48]** to $78,452.25 of alleged income, and the nature of her work at Artnouveau

is irrelevant to whether she earned the $78,452.25 as compensation for that work.

Respondent's determination is entitled to the presumption of correctness, and

absent evidence of another plausible source for this additional $78,452.25 of

income, we find that it constitutes net earnings from self-employment and is

subject to self-employment tax.[22]

---

[22]Some evidence in the record suggests that Ms. Na might properly have been classified as an employee of Artnouveau, in which case she would not be subject to self-employment tax. Instead, her employer would be obliged to withhold her share of tax due under the Federal Insurance Contributions Act (FICA). See sec. 3102.

   For FICA purposes, whether a worker qualifies as an employee is generally determined under the common law rules. See sec. 3121(d)(2). "The courts have considered several factors in determining the existence of the employer-employee relationship. Among those factors are: (1) the right to control the details of the work; (2) furnishing of tools and the work place; (3) withholding of taxes, workmen's compensation and unemployment insurance funds; (4) right to discharge; and (5) permanency of the relationship." Prof'l & Exec. Leasing, Inc. v. Commissioner, 862 F.2d 751, 753 (9th Cir. 1988), aff'g 89 T.C. 225 (1987). We accord the first of these factors, right to control, the most weight. See Chin v. United States, 57 F.3d 722, 725 (9th Cir. 1995).

   On one hand, Ms. Na testified that Mr. Choi established her working hours and that she made deposits and withdrawals and wrote checks from her accounts on Mr. Choi's instructions. These facts support the first factor. She further testified that she performed services on Artnouveau's premises, which supports the second factor. On the other hand, the record affords no information concerning what services Ms. Na performed for Artnouveau while in her workplace. She wrote, cashed, and deposited checks for Mr. Choi, but she has never suggested that these activities comprised the sum total of her job or that she was being paid for them. The Court lacks sufficient evidence to determine what

(continued...)

**[\*49]** IV.    Accuracy-Related Penalty

Respondent determined a section 6662(a) accuracy-related penalty of $73,459.40 on the basis of, in the alternative, negligence or disregard of rules and regulations, a substantial understatement of income tax, or a substantial valuation misstatement.  As a general rule, the Commissioner bears the burden of production and "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty."  Higbee v. Commissioner, 116 T.C. 438, 446 (2001); see sec. 7491(c).  Once respondent has met this burden of production, the burden will shift to petitioner to prove an affirmative defense or that she is otherwise not liable for the penalty.  See Higbee v. Commissioner, 116 T.C. at 446-447.

---

[22](...continued)
duties Ms. Na performed to earn the additional income at issue in this case, and we thus cannot ascertain to what degree Mr. Choi  controlled her performance. Further, we have no facts concerning the "tools" she employed (other than bank accounts that she herself supplied) or the permanency of her work.  The record suggests that neither Artnouveau nor Mr. Choi withheld income or FICA taxes from the remuneration paid to Ms. Na.  In short, the limited facts before us are a mixed bag.  Ms. Na did not dispute her employment classification in her petition, at trial, or on brief, and the evidence before us does not suffice to overcome the presumption in favor of respondent.

[*50] A.     Petitioner's Liability

Section 6662(a) and (b)(3) provides for imposition of a 20% penalty on the portion of an underpayment of tax required to be shown on a return that is attributable to a substantial valuation misstatement.  For returns filed on or after August 17, 2006, as is relevant here, a substantial valuation misstatement occurs when "the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by chapter 1 is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)".  Sec. 6662(e)(1)(A).  The notice of deficiency does not explain what property's value or adjusted basis respondent believes Ms. Na misstated.  Respondent did not discuss this determination at trial and has not addressed it on brief.  As the Court can find no basis for this determination in the record, we find Ms. Na not liable for the substantial valuation misstatement penalty.

Section 6662(a) and (b)(1) and (2) provides for imposition of a 20% penalty on the portion of an underpayment of tax attributable to negligence or disregard of rules and regulations or a substantial understatement of income tax.  "'[N]egligence' includes any failure to make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue Code]".  Sec. 6662(c).  It constitutes "'a lack of due care or the failure to do what a reasonable and ordinarily prudent

[*51] person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), aff'g 43 T.C. 168 (1964) and T.C. Memo. 1964-299), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991). "'Negligence' also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly." Sec. 1.6662-3(b)(1), Income Tax Regs. A substantial understatement of income tax as to an individual is an understatement that exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A).

Whether a substantial understatement exists, and if so, in what amount, will depend upon the recalculation of Ms. Na's tax liability in view of this opinion. We leave this calculation to the parties under Rule 155. Regardless of whether Ms. Na is liable for the substantial understatement penalty, however, Ms. Na is liable for the negligence penalty.[23]

On that score, respondent contends that Ms. Na failed to maintain adequate books and records. Ms. Na did not maintain contemporaneous records of the funds she received and paid out on Mr. Choi's behalf. She did not establish a formal trust relationship or advise Hanmi Bank that she was using the accounts as

---

[23]In any event, Ms. Na will be liable for only a 20% penalty, as the accuracy-related penalties do not stack. See sec. 1.6662-2(c), Income Tax Regs.

[*52] trust accounts.  She commingled her own funds with Mr. Choi's in the accounts, compounding the uncertainty created by her inadequate recordkeeping. We concluded that Ms. Na's attempt at reconstructing records, together with her testimony, sufficed to carry her burden of proof in the absence of any contrary evidence.  But a reasonable and ordinarily prudent person would have contemporaneously documented the nature of the cashflows as well as her status as a mere agent, conduit, or trustee, including, in the latter case, the identity of the trust beneficiary or beneficiaries.  Ms. Na took none of these steps.  We conclude that respondent has satisfied his burden of production as to the negligence penalty. See sec. 1.6662-3(b)(1), Income Tax Regs.

B.  Petitioner's Defense

Section 6664(c) provides a defense to the section 6662(a) penalties with respect to any portion of an underpayment of tax for which the taxpayer had reasonable cause and with respect to which the taxpayer acted in good faith.  "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances."  Sec. 1.6664-4(b)(1), Income Tax Regs.  "Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability."  Id.

[*53] In her posttrial briefs, Ms. Na asserts, without elaboration, that she had a reasonable basis for not reporting as income funds that she temporarily held for and returned to Mr. Choi.[24] While that assertion may well be accurate, it sheds no light on whether Ms. Na had reasonable cause for her failure to report as income the additional deposits to her accounts beyond the amounts we have held she received as a conduit for Mr. Choi. As to $2,266.81 of her unreported deposits, Ms. Na offered no argument or evidence that these constituted conduit payments. As to another $76,185.44, Ms. Na failed to establish that she received and paid out these deposits on Mr. Choi's behalf. She maintained no contemporaneous records of the conduit payments she received, and she offered no testimony or other evidence concerning her efforts to ascertain her proper tax liability.

Ms. Na has not explained the legal theory underlying her reasonable cause claim on brief;[25] nor has she pointed to any specific factual support for it in the

---

[24]Ms. Na did not raise this affirmative defense or plead any of the relevant facts in her petition. Ordinarily, an affirmative defense not pleaded "is deemed to be waived." Gustafson v. Commissioner, 97 T.C. 85, 90 (1991). Because respondent has not objected, however, and because both parties address the defense in their briefs, we will treat it as an issue tried by implied consent of the parties under Rule 41(b)(1).

[25]A taxpayer may establish a sec. 6664(c) reasonable cause defense by showing that he or she relied reasonably and in good faith on a third party's advice in taking the disputed tax position. See sec. 1.6664-4(c), Income Tax Regs.; see

(continued...)

**[*54]** record. Even if we construe her claim as an assertion that she believed all

funds she deposited during 2008 in excess of her reported gross income belonged

to Mr. Choi, we have virtually no evidentiary basis on which to evaluate the

reasonableness of that belief. The evidence we do have suggests that belief was

not reasonable. Given that Ms. Na failed to maintain contemporaneous records of

which deposits were conduit payments and which were her own, she apparently

had no factual basis upon which to distinguish among them in computing her

income at yearend. As Ms. Na bears the burden of proof with regard to her

affirmative defense, the Court will not speculate as to the specifics of her theory or

---

²⁵(...continued)
also Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000) (holding that, for a taxpayer to rely reasonably upon advice, "the taxpayer must prove * * * that * * * : (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment."), aff'd, 299 F.3d 221 (3d Cir. 2002); Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 & n.8 (9th Cir. 2005) (quoting three-prong test in Neonatology Assocs. with approval), aff'g 121 T.C. 89 (2003), supplemented by T.C. Memo. 2004-43.

Although Ms. Na did rely upon Mr. Chyun--who, as an experienced C.P.A., was a competent professional with sufficient expertise to justify reliance--to prepare her income tax returns, she has not alleged reliance upon his advice as a basis for her reasonable cause defense. Even if she had, however, Ms. Na offered no evidence that she ever discussed her bank deposits with Mr. Chyun or that she received and relied upon advice from him as to the deposits' character, before she filed her 2008 tax return. Hence, the record does not support a finding of reasonable reliance.

**[*55]** infer facts not in evidence.  We instead conclude that she has not carried her burden with respect to the reasonable cause defense.

Accordingly, we hold that Ms. Na is liable for the section 6662(a) and (b)(1) negligence penalty with respect to the portion of the underpayment attributable to her failure to report $78,452.25 of income.

The Court has considered all of the parties' contentions, arguments, requests, and statements.  To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.

[*56]                              APPENDIX A

| Account 0349 Deposits By Payor | | | | |
|---|---|---|---|---|
| **Record Citation** | **Pay Date** | **Payor** | **Transfer Type** | **Amount In** |
| 8-J at 81, 83 | 03/18/08 | Account 5289 | Check | $5,000.00 |
| 8-J at 81, 93 | 04/03/08 | Account 5289 | Check | $20,000.00 |
| 8-J at 96, 109 | 05/09/08 | Account 5289 | Check | $300,000.00 |
| 8-J at 169 | 12/02/08 | Account 5289 | Wire | $10,000.00 |
| 8-J at 170 | 12/08/08 | Account 5289 | Wire | $10,000.00 |
| 8-J at 169 | 12/18/08 | Account 5289 | Wire | $5,000.00 |
| 8-J at 184 | 01/08/09 | Account 5289 | | $20,000.00 |
| | | Total: | | $370,000.00 |
| | | | | |
| 8-J at 64, 66 | 01/16/08 | Angie H. In [$500 loan] | Check | $500.00 |
| 8-J at 96, 108 | 05/05/08 | Angie H. In | Check | $500.00 |
| 8-J at 111, 113-115 | 05/16/08 | Angie H. In [$100 cash] | Check | $400.00 |
| 8-J at 135, 137, 139 | 07/21/08 | Angie H. In | Check | $500.00 |
| | | Total: | | $1,900.00 |
| | | | | |
| 8-J at 59, 61 | 01/02/08 | Artnouveau | Check | $10,000.00 |
| 8-J at 59, 62 | 01/07/08 | Artnouveau | Check | $20,000.00 |
| 8-J at 64, 67 | 01/16/08 | Artnouveau | Check | $10,000.00 |
| 8-J at 64, 68 | 01/23/08 | Artnouveau | Check | $3,162.00 |
| 8-J at 64, 69 | 01/23/08 | Artnouveau | Check | $6,794.50 |
| 8-J at 64, 70 | 02/05/08 | Artnouveau | Check | $20,000.00 |
| 8-J at 64, 72 | 02/15/08 | Artnouveau | Check | $1,500.00 |
| 8-J at 73, 75 | 02/29/08 | Artnouveau | Check | $1,500.00 |
| 8-J at 73, 77 | 03/04/08 | Artnouveau | Check | $1,162.62 |
| 8-J at 73, 78 | 03/05/08 | Artnouveau | Check | $30,000.00 |
| 8-J at 73, 79 | 03/07/08 | Artnouveau | Check | $904.80 |
| 8-J at 81, 88 | 03/27/08 | Artnouveau | Check | $1,500.00 |
| 8-J at 81, 89 | 04/01/08 | Artnouveau | Check | $1,500.00 |
| 8-J at 81, 90 | 04/01/08 | Artnouveau | Check | $21,000.00 |
| 8-J at 81, 94 | 04/04/08 | Artnouveau | Check | $10,000.00 |
| 8-J at 81, 95 | 04/15/08 | Artnouveau | Check | $1,500.00 |
| 8-J at 96, 99, 101 | 04/28/08 | Artnouveau | Check | $20,000.00 |
| 8-J at 96, 103 | 04/30/08 | Artnouveau | Check | $1,500.00 |
| 8-J at 96, 104 | 04/30/08 | Artnouveau | Check | $2,769.68 |
| 8-J at 96, 110 | 05/15/08 | Artnouveau | Check | $1,500.00 |
| 8-J at 111, 116 | 05/20/08 | Artnouveau | Check | $14,500.00 |

[*57]

| | | | | |
|---|---|---|---|---|
| 8-J at 111, 117 | 05/20/08 | Artnouveau | Check | $10,000.00 |
| 8-J at 111, 119, 121 | 05/30/08 | Artnouveau | Check | $1,500.00 |
| 8-J at 111, 127 | 06/16/08 | Artnouveau | Check | $1,500.00 |
| 8-J at 128, 130 | 07/01/08 | Artnouveau | Check | $1,500.00 |
| 8-J at 128, 133 | 07/10/08 | Artnouveau | Check | $7,170.44 |
| 8-J at 128, 134 | 07/10/08 | Artnouveau | Check | $19,200.00 |
| 8-J at 135, 137, 138 | 07/21/08 | Artnouveau | Check | $1,500.00 |
| 8-J at 135, 140, 141 | 08/01/08 | Artnouveau | Check | $1,500.00 |
| 8-J at 135, 142, 143 | 08/11/08 | Artnouveau | Check | $6,600.00 |
| 8-J at 135, 142, 144 | 08/11/08 | Artnouveau | Check | $19,000.00 |
| 8-J at 135, 145 | 08/15/08 | Artnouveau | Check | $1,400.00 |
| 8-J at 149, 152 | 08/29/08 | Artnouveau | Check | $350.00 |
| 8-J at 149, 151 | 08/29/08 | Artnouveau | Check | $1,400.00 |
| 8-J at 149, 153 | 09/05/08 | Artnouveau | | $6,000.00 |
| 8-J at 149, 155 | 09/15/08 | Artnouveau | Check | $1,400.00 |
| 8-J at 156, 159 | 10/15/08 | Artnouveau | Check | $658.00 |
| 8-J at 156, 158 | 10/15/08 | Artnouveau | Check | $1,400.00 |
| 8-J at 156, 160 | 10/17/08 | Artnouveau | Check | $2,000.00 |
| 8-J at 161, 164 | 10/31/08 | Artnouveau | Check | $1,400.00 |
| 8-J at 161, 163 | 10/31/08 | Artnouveau | Check | $4,603.87 |
| 8-J at 161, 166 | 11/14/08 | Artnouveau | Check | $1,600.00 |
| 8-J at 161, 167 | 11/17/08 | Artnouveau | Check | $3,764.31 |
| 8-J at 169, 171 | 11/21/08 | Artnouveau | Check | $1,210.77 |
| 8-J at 169, 173 | 11/28/08 | Artnouveau | Check | $1,600.00 |
| 8-J at 169, 174 | 12/03/08 | Artnouveau | Check | $1,974.00 |
| 8-J at 169, 179, 181 | 12/15/08 | Artnouveau | Check | $1,600.00 |
| 8-J at 184, 189 | 12/31/08 | Artnouveau | Check | $1,600.00 |
| | | Total: | | $284,224.99 |
| | | | | |
| 8-J at 81, 84-85 | 03/24/08 | Cash | Cash | $100.00 |
| 8-J at 81, 86-87 | 03/24/08 | Cash | Cash | $500.00 |
| 8-J at 96, 99, 100 | 04/28/08 | Cash | Cash | $5,000.00 |
| 8-J at 111, 119, 120 | 05/30/08 | Cash | Cash | $5,000.00 |
| 8-J at 111, 123, 124 | 06/02/08 | Cash | Cash | $8,000.00 |
| 8-J at 111, 125, 126 | 06/03/08 | Cash | Cash | $5,000.00 |
| 8-J at 135, 147, 148 | 08/18/08 | Cash | Cash | $6,000.00 |
| 8-J at 169, 175, 176 | 12/04/08 | Cash | Cash | $3,000.00 |
| 8-J at 169, 177, 178 | 12/08/08 | Cash | Cash | $3,000.00 |
| 8-J at 169, 179, 180 | 12/15/08 | Cash | Cash | $100.00 |
| 8-J at 169, 182, 183 | 12/18/08 | Cash | Cash | $2,100.00 |
| 8-J at 184, 186, 187 | 12/22/08 | Cash | Cash | $3,000.00 |
| 8-J at 184, 10-J at 225 | 01/05/09 | Cash | Cash | $3,000.00 |
| | | Total: | | $43,800.00 |

[*58]

| | | | | |
|---|---|---|---|---|
| 8-J at 59, 63 | 01/07/08 | Chul & Shelly Kim | Check | $500.00 |
| 8-J at 96, 106 | 05/01/08 | Chul & Shelly Kim | Check | $2,000.00 |
| 8-J at 111, 122 | 06/02/08 | Chul & Shelly Kim | Check | $2,000.00 |
| | | Total: | | $4,500.00 |
| | | | | |
| 8-J at 64, 71 | 02/14/08 | Doo Young Choi | Check | $5,000.00 |
| 8-J at 73, 76 | 03/03/08 | Doo Young Choi | Check | $2,100.00 |
| 8-J at 73, 80 | 03/12/08 | Doo Young Choi | Check | $8,893.61 |
| 8-J at 96, 98 | 04/17/08 | Doo Young Choi | Check | $9,900.00 |
| 8-J at 96, 99, 102 | 04/28/08 | Doo Young Choi | Check | $1,800.00 |
| 8-J at 96, 107 | 05/01/08 | Doo Young Choi | Check | $2,000.00 |
| 8-J at 135, 146 | 08/15/08 | Doo Young Choi | Check | $18.00 |
| 8-J at 161, 165 | 11/13/08 | Doo Young Choi | Check | $10,000.00 |
| 8-J at 161, 168 | 11/20/08 | Doo Young Choi | Check | $2,984.22 |
| 8-J at 169, 172 | 11/21/08 | Doo Young Choi | Check | $1,550.00 |
| | | Total: | | $44,245.83 |
| | | | | |
| 8-J at 128, 131 | 07/01/08 | Eric & Mihwa Mekus | Check | $1,000.00 |
| | | Total: | | $1,000.00 |
| | | | | |
| 8-J at 81, 91 | 04/02/08 | JK WW Enterprise | Check | $7,000.00 |
| | | Total: | | $7,000.00 |
| | | | | |
| 8-J at 81, 92 | 04/03/08 | Koram Consulting | Check | $1,609.00 |
| | | Total: | | $1,609.00 |
| | | | | |
| 8-J at 128 | 07/03/08 | Lee Gi Cheol | Wire | $5,976.50 |
| | | Total: | | $5,976.50 |
| | | | | |
| 8-J at 96, 105, 16-P at 3 | 04/30/08 | Newkoa LLC | Check | $100,000.00 |
| | | Total: | | $100,000.00 |
| | | | | |
| 8-J at 128, 132 | 07/10/08 | Pixma | Check | $500.00 |
| | | Total: | | $500.00 |
| | | | | |
| 8-J at 149, 154 | 09/10/08 | Sunmin Kim | Check | $2,834.94 |
| 8-J at 184, 188 | 12/23/08 | Sunmin Kim | Check | $801.49 |
| | | Total: | | $3,636.43 |
| | | | | |
| | | | | |
| 8-J at 59 | 12/17/07 | Unknown | | $3,000.00 |
| 8-J at 59 | 12/17/07 | Unknown | | $10,000.00 |

[*59]

| | | | | |
|---|---|---|---|---|
| 8-J at 59 | 12/26/07 | Unknown | | $1,442.00 |
| 8-J at 59 | 12/28/07 | Unknown | | $685.00 |
| 8-J at 59 | 12/28/07 | Unknown | | $2,000.00 |
| 8-J at 184 | 01/16/09 | Unknown | | $1,600.00 |
| | | Total: | | $18,727.00 |
| | | | | |
| 8-J at 111, 118 | 05/20/08 | Voyager Insurance | Check | $12.72 |
| | | Total: | | $12.72 |
| | | | | |
| | | GRAND TOTAL: | | $887,132.47 |

**[*60]**                     APPENDIX B

| Account 5289 Deposits By Payor | | | | |
|---|---|---|---|---|
| **Record Citation** | **Pay Date** | **Payor** | **Transfer Type** | **Amount In** |
| 11-J at 226, 229 | 01/30/08 | Account 0349 | Check | $5,000.00 |
| 11-J at 230, 235 | 02/06/08 | Account 0349 | Check | $10,000.00 |
| 11-J at 260, 262, 264 | 06/05/08 | Account 0349 | Check | $6,000.00 |
| 11-J at 285, 287 | 08/14/08 | Account 0349 | Check | $18,000.00 |
| 11-J at 302 | 11/24/08 | Account 0349 | Wire | $10,000.00 |
| 11-J at 305 | 12/10/08 | Account 0349 | Wire | $15,000.00 |
| | | Total: | | $64,000.00 |
| | | | | |
| 11-J at 230, 234 | 02/06/08 | Angie H. In | Check | $500.00 |
| 11-J at 279, 284 | 07/25/08 | Angie H. In | Check | $13,570.00 |
| | | Total: | | $14,070.00 |
| | | | | |
| 11-J at 226, 228 | 01/07/08 | Artnouveau | Check | $30,000.00 |
| 11-J at 230, 232 | 02/01/08 | Artnouveau | Check | $30,000.00 |
| 11-J at 230, 233 | 02/05/08 | Artnouveau | Check | $5,000.00 |
| 11-J at 242, 244 | 03/18/08 | Artnouveau | Check | $100,000.00 |
| 11-J at 242, 245 | 03/31/08 | Artnouveau | Check | $10,000.00 |
| 11-J at 246, 250 | 04/16/08 | Artnouveau | Check | $5,000.00 |
| 11-J at 246, 248 | 04/16/08 | Artnouveau | Check | $7,500.00 |
| 11-J at 246, 251 | 04/21/08 | Artnouveau | Check | $1,828.00 |
| 11-J at 246, 252 | 04/21/08 | Artnouveau | Check | $3,400.00 |
| 11-J at 246, 253 | 04/21/08 | Artnouveau | Check | $1,995.00 |
| 11-J at 246, 255 | 04/24/08 | Artnouveau | Check | $10,000.00 |
| 11-J at 279, 283 | 07/09/08 | Artnouveau | Check | $13,050.00 |
| 11-J at 279, 282 | 07/09/08 | Artnouveau | Check | $12,500.00 |
| 11-J at 279, 281 | 07/09/08 | Artnouveau | Check | $16,500.00 |
| 11-J at 288, 292 | 09/09/08 | Artnouveau | Check | $10,200.00 |
| 11-J at 288, 295 | 09/10/08 | Artnouveau | Check | $4,500.00 |
| 11-J at 288, 294 | 09/10/08 | Artnouveau | Check | $1,835.00 |
| 11-J at 288, 297 | 09/30/08 | Artnouveau | Check | $1,400.00 |
| 11-J at 288, 296 | 09/30/08 | Artnouveau | Check | $4,762.62 |
| 11-J at 298, 301 | 10/24/08 | Artnouveau | Check | $8,000.00 |
| 11-J at 298, 300 | 10/24/08 | Artnouveau | Check | $8,858.60 |
| 11-J at 305, 307 | 12/18/08 | Artnouveau | Check | $5,013.05 |
| 11-J at 305, 308 | 12/18/08 | Artnouveau | Check | $1,605.00 |
| | | Total: | | $292,947.27 |

[*61]

| | | | | |
|---|---|---|---|---|
| 11-J at 230, 236, 237 | 02/13/08 | Cash | Cash | $100.00 |
| 11-J at 260, 262, 263 | 06/05/08 | Cash | Cash | $8,800.00 |
| 11-J at 260, 265, 266 | 06/09/08 | Cash | Cash | $8,550.00 |
| 11-J at 260, 267, 268 | 06/11/08 | Cash | Cash | $7,800.00 |
| 11-J at 260, 269, 270 | 06/13/08 | Cash | Cash | $8,500.00 |
| 11-J at 260, 271, 272 | 06/16/08 | Cash | Cash | $7,200.00 |
| 11-J at 260, 273, 274 | 06/20/08 | Cash | Cash | $8,500.00 |
| 11-J at 260, 275, 276 | 06/24/08 | Cash | Cash | $6,500.00 |
| 11-J at 260, 277, 278 | 06/30/08 | Cash | Cash | $5,500.00 |
| | | Total: | | $61,450.00 |
| | | | | |
| 11-J at 288, 293 | 09/09/08 | Chase Auto | Check | $47.98 |
| | | Total: | | $47.98 |
| | | | | |
| 11-J at 230, 236, 238 | 02/13/08 | Doo Young Choi | Check | $20,400.00 |
| 11-J at 230, 239 | 02/13/08 | Doo Young Choi | Check | $10,000.00 |
| 11-J at 230 | 02/29/08 | Doo Young Choi | Wire | $179,995.00 |
| 11-J at 246, 249 | 04/16/08 | Doo Young Choi | Check | $9,900.00 |
| 11-J at 246, 254 | 04/21/08 | Doo Young Choi | Check | $2,000.00 |
| 11-J at 256, 258 | 05/07/08 | Doo Young Choi | Check | $349,900.00 |
| 11-J at 256, 259 | 05/27/08 | Doo Young Choi | Check | $150,000.00 |
| 11-J at 302, 304 | 11/07/08 | Doo Young Choi | Check | $15,000.00 |
| | | Total: | | $737,195.00 |
| | | | | |
| 11-J at 226 | 01/31/08 | Hanmi Bank | Interest | $270.65 |
| 11-J at 230 | 02/29/08 | Hanmi Bank | Interest | $281.26 |
| 11-J at 242 | 03/31/08 | Hanmi Bank | Interest | $375.66 |
| 11-J at 246 | 04/30/08 | Hanmi Bank | Interest | $144.78 |
| 11-J at 256 | 05/30/08 | Hanmi Bank | Interest | $239.16 |
| 11-J at 260 | 06/30/08 | Hanmi Bank | Interest | $133.32 |
| 11-J at 279 | 07/31/08 | Hanmi Bank | Interest | $243.49 |
| 11-J at 285 | 08/29/08 | Hanmi Bank | Interest | $241.39 |
| 11-J at 288 | 09/30/08 | Hanmi Bank | Interest | $275.51 |
| 11-J at 298 | 10/31/08 | Hanmi Bank | Interest | $467.02 |
| 11-J at 302 | 11/28/08 | Hanmi Bank | Interest | $225.66 |
| 11-J at 305 | 12/31/08 | Hanmi Bank | Interest | $240.77 |
| | | Total: | | $3,138.67 |
| | | | | |
| 11-J at 288, 290, 16-P at 27 | 09/05/08 | Prima Escrow | Check | $18,103.89 |
| 11-J at 288, 291, 16-P at 28 | 09/05/08 | Prima Escrow | Check | $4,000.00 |
| | | Total: | | $22,103.89 |

[*62]

| | | | | |
|---|---|---|---|---|
| 11-J at 230, 240 | 02/15/08 | Saehan Bank | Cashier Ck | $60,000.00 |
| 11-J at 230, 241 | 02/19/08 | Saehan Bank | Cashier Ck | $25,000.00 |
| | | Total: | | $85,000.00 |
| | | | | |
| | | GRAND TOTAL: | | $1,279,952.81 |

[*63]                          APPENDIX C

| Account 0349 Debits by Payee | | | | |
|---|---|---|---|---|
| **Record Citation** | **Pay Date** | **Payee** | **Transfer Type** | **Amount Out** |
| 8-J at 64, 9-J at 217 | 01/30/08 | Account 5289 | Check | $5,000.00 |
| 8-J at 64, 9-J at 218 | 02/06/08 | Account 5289 | Check | $10,000.00 |
| 8-J at 135, 9-J at 219 | 08/14/08 | Account 5289 | Check | $18,000.00 |
| 8-J at 170 | 11/24/08 | Account 5289 | Wire | $10,000.00 |
| 8-J at 169 | 12/10/08 | Account 5289 | Wire | $15,000.00 |
| | | Total: | | $58,000.00 |
| | | | | |
| 8-J at 64, 16-P at 70 | 01/16/08 | Angie In | Check | $1,500.00 |
| | | Total: | | $1,500.00 |
| | | | | |
| 8-J at 96, 9-J at 190 | 05/09/08 | Artnouveau | Check | $29,745.00 |
| 8-J at 96, 9-J at 191 | 05/09/08 | Artnouveau | Check | $64,984.00 |
| 8-J at 96, 9-J at 192 | 05/09/08 | Artnouveau | Check | $65,662.00 |
| 8-J at 96, 9-J at 193 | 05/09/08 | Artnouveau | Check | $40,000.00 |
| 8-J at 96, 9-J at 194 | 05/09/08 | Artnouveau | Check | $81,522.00 |
| 8-J at 96, 9-J at 195 | 05/09/08 | Artnouveau | Check | $66,837.00 |
| | | Total: | | $348,750.00 |
| | | | | |
| 8-J at 73, 9-J at 196 | 03/06/08 | Belle Collection | Check | $30,000.00 |
| | | Total: | | $30,000.00 |
| | | | | |
| 8-J at 64, 16-P at 53 | 01/16/08 | Blank | Check | $204.70 |
| 8-J at 64, 16-P at 68 | 01/18/08 | Blank | Check | $550.00 |
| 8-J at 64, 16-P at 64 | 01/24/08 | Blank | Check | $217.37 |
| 8-J at 64, 16-P at 63 | 01/24/08 | Blank | Check | $600.00 |
| 8-J at 64, 16-P at 62 | 01/24/08 | Blank | Check | $500.00 |
| 8-J at 135, 9-J at 204, 16-P at 48 | 08/11/08 | Blank | Check | $5,000.00 |
| 8-J at 149, 9-J at 220, 16-P at 49 | 09/12/08 | Blank | Check | $5,500.00 |
| 8-J at 169, 9-J at 221, 16-P at 54 | 12/18/08 | Blank | Check | $5,013.05 |
| | | Total: | | $17,585.12 |
| | | | | |
| 8-J at 64, 9-J at 215, 12-J at 321, 16-P at 34 | 01/16/08 | Cash | Check | $5,000.00 |

**[*64]**

| | | | | |
|---|---|---|---|---|
| 8-J at 64, 16-P at 56 | 01/25/08 | Cash | Check | $247.83 |
| 8-J at 64, 16-P at 55 | 01/29/08 | Cash | Check | $262.00 |
| 8-J at 73, 9-J at 216, 16-P at 37 | 03/12/08 | Cash | Check | $8,850.00 |
| 8-J at 81, 9-J at 197, 16-P at 39 | 04/09/08 | Cash | Check | $5,250.00 |
| | | Total: | | $19,609.83 |
| | | | | |
| 8-J at 60 | 01/02/08 | Chase Epay | Direct Debit | $33.00 |
| 8-J at 60, 16-P at 74 | 01/07/08 | Chase Auto | Direct Debit | $1,977.76 |
| 8-J at 135 | 08/06/08 | Chase Epay | Direct Debit | $99.00 |
| 8-J at 161 | 11/13/08 | Chase Epay | Direct Debit | $1,152.99 |
| | | Total: | | $3,262.75 |
| | | | | |
| 8-J at 64, 16-P at 66 | 01/22/08 | Computer On-Site Svc | Check | $85.00 |
| 8-J at 64, 16-P at 65 | 01/22/08 | Computer On-Site Svc | Check | $380.00 |
| 8-J at 64, 16-P at 61 | 01/25/08 | Computer On-Site Svc | Check | $85.00 |
| 8-J at 64, 16-P at 60 | 01/28/08 | Computer On-Site Svc | Check | $800.00 |
| | | Total: | | $1,350.00 |
| | | | | |
| 8-J at 96 | 04/25/08 | Credit Card | Direct Debit | $6,000.00 |
| 8-J at 96, 16-P at 74 | 05/05/08 | Credit Card | Direct Debit | $9,332.91 |
| 8-J at 111, 16-P at 80 | 06/03/08 | Credit Card | Direct Debit | $1,941.38 |
| 8-J at 128, 16-P at 81 | 07/07/08 | Credit Card | Direct Debit | $1,807.27 |
| 8-J at 128 | 07/14/08 | Credit Card | Direct Debit | $1,807.27 |
| 8-J at 135, 16-P at 82 | 07/24/08 | Credit Card | Direct Debit | $5,470.89 |
| 8-J at 149, 16-P at 83 | 08/27/08 | Credit Card | Direct Debit | $2,641.61 |
| 8-J at 161, 16-P at 84 | 10/23/08 | Credit Card | Direct Debit | $5,197.70 |
| 8-J at 161, 16-P at 84 | 11/05/08 | Credit Card | Direct Debit | $2,500.00 |
| | | Total: | | $36,699.03 |
| | | | | |
| 8-J at 65 | 01/23/08 | Deluxe Check | Direct Debit | $14.10 |
| | | Total: | | $14.10 |
| | | | | |
| 8-J at 161, 9-J at 205, 16-P at 50 | 11/14/08 | Downtown Motors | Check | $10,000.00 |
| | | Total: | | $10,000.00 |
| | | | | |
| 8-J at 59, 9-J at 199, 16-P at 29 | 01/08/08 | Doo Young Choi | Check | $20,000.00 |
| 8-J at 81, 9-J at 200, 16-P at 31 | 03/18/08 | Doo Young Choi | Check | $9,968.00 |

[*65]

| | | | | |
|---|---|---|---|---|
| 8-J at 81, 9-J at 201, 16-P at 30 | 04/04/08 | Doo Young Choi | Check | $18,000.00 |
| 8-J at 81, 9-J at 202, 16-P at 32 | 04/07/08 | Doo Young Choi | Check | $6,609.00 |
| 8-J at 96, 9-J at 203, 16-P at 33 | 04/29/08 | Doo Young Choi | Check | $25,000.00 |
| | | Total: | | $79,577.00 |
| | | | | |
| 8-J at 96, 9-J at 206, 16-P at 40 | 05/05/08 | Eun Mi Kwon | Check | $50,000.00 |
| | | Total: | | $50,000.00 |
| | | | | |
| 8-J at 81, 9-J at 207, 16-P at 38 | 04/01/08 | Gui Gui & Gu Gu | Check | $21,000.00 |
| | | Total: | | $21,000.00 |
| | | | | |
| 8-J at 59; 16-P at 72 | 01/04/08 | Hampshire Place Apt | Check | $1,951.87 |
| 8-J at 65 | 02/06/08 | EQ Hampshire PL | Direct Debit | $1,962.96 |
| 8-J at 112 | 06/16/08 | EQ Hampshire PL | Check | $3.37 |
| 8-J at 156 | 10/03/08 | EQ Hampshire PL | Check | $58.59 |
| 8-J at 156 | 10/06/08 | EQ Hampshire PL | Direct Debit | $470.00 |
| 8-J at 161 | 11/05/08 | EQ Hampshire PL | Check | $1,313.97 |
| 8-J at 170 | 12/02/08 | EQ Hampshire PL | Direct Debit | $1,295.17 |
| | | Total: | | $7,055.93 |
| | | | | |
| 8-J at 128, 9-J at 208, 16-P at 45 | 07/11/08 | Han Som | Check | $6,000.00 |
| | | Total: | | $6,000.00 |
| | | | | |
| 8-J at 135, 9-J at 209, 16-P at 47 | 08/11/08 | Hanmi Bank | Check | $6,600.00 |
| 8-J at 169, 9-J at 210, 16-P at 51 | 12/03/08 | Hanmi Bank | Check | $10,000.00 |
| | | Total: | | $16,600.00 |
| | | | | |
| 8-J at 64, 16-P at 69 | 01/22/08 | Helio | Check | $178.96 |
| | | Total: | | $178.96 |
| | | | | |
| 8-J at 111, 9-J at 211, 16-P at 42 | 05/29/08 | Int'l Watches | Check | $10,000.00 |
| | | Total: | | $10,000.00 |

- 66 -

**[*66]**

| | | | | |
|---|---|---|---|---|
| 8-J at 64, 16-P at 73 | 01/18/08 | Joon Ha Kim | Check | $1,500.00 |
| | | Total: | | $1,500.00 |
| | | | | |
| 8-J at 64, 16-P at 67 | 01/24/08 | LA Dep't Water & Power | Check | $69.62 |
| | | Total: | | $69.62 |
| | | | | |
| 8-J at 73, 16-P at 57 | 02/19/08 | Media Master | Check | $306.93 |
| | | Total: | | $306.93 |
| | | | | |
| 8-J at 135, 9-J at 196, 16-P at 46 | 07/31/08 | Mega Diamonds (Cash) | Check | $8,787.00 |
| | | Total: | | $8,787.00 |
| | | | | |
| 8-J at 65 | 01/22/08 | Mercedes Lease | Check | $582.66 |
| 8-J at 73 | 02/19/08 | Mercedes Lease | Check | $582.66 |
| 8-J at 81 | 03/17/08 | Mercedes Lease | Check | $582.66 |
| 8-J at 81 | 04/14/08 | Mercedes Lease | Check | $582.66 |
| 8-J at 96 | 05/12/08 | Mercedes Lease | Direct Debit | $582.66 |
| 8-J at 112 | 06/16/08 | Mercedes Lease | Check | $582.66 |
| 8-J at 128 | 07/16/08 | Mercedes Lease | Check | $582.66 |
| 8-J at 135 | 08/20/08 | Mercedes Lease | Direct Debit | $582.66 |
| 8-J at 149 | 09/16/08 | Mercedes Lease | Direct Debit | $582.66 |
| 8-J at 161 | 10/20/08 | Mercedes Lease | Direct Debit | $582.66 |
| 8-J at 170 | 12/16/08 | Mercedes Lease | Check | $769.57 |
| | | Total: | | $6,596.17 |
| | | | | |
| 8-J at 111, 9-J at 212, 16-P at 41 | 05/29/08 | Onyx Diamonds | Check | $13,500.00 |
| | | Total: | | $13,500.00 |
| | | | | |
| 8-J at 64, 16-P at 59 | 01/28/08 | Oscar Cervantes | Check | $100.00 |
| | | Total: | | $100.00 |
| | | | | |
| 8-J at 64, 16-P at 58 | 01/29/08 | Pitney Bowes | Check | $97.39 |
| | | Total: | | $97.39 |
| | | | | |
| 8-J at 111, 9-J at 213, 16-P at 43 | 06/03/08 | Saade Diamonds | Check | $5,000.00 |
| 8-J at 111, 9-J at 214, 16-P at 44 | 06/03/08 | Saade Diamonds | Check | $5,900.00 |
| | | Total: | | $10,900.00 |

[*67]

| | | | | |
|---|---|---|---|---|
| 8-J at 73, 16-P at 76 | 02/21/08 | Safeco Insurance | Direct Debit | $1,913.40 |
| | | Total: | | $1,913.40 |
| | | | | |
| 8-J at 64, 16-P at 52 | 01/30/08 | South Coast Helicopters | Check | $3,562.50 |
| | | Total: | | $3,562.50 |
| | | | | |
| 8-J at 59; 16-P at 71 | 01/07/08 | Standard Parking | Check | $615.00 |
| | | Total: | | $615.00 |
| | | | | |
| 8-J at 65, 16-P at 75 | 01/24/08 | T-Mobile | Direct Debit | $74.58 |
| 8-J at 65, 16-P at 75 | 01/25/08 | T-Mobile | Direct Debit | $70.20 |
| 8-J at 73, 16-P at 76 | 02/25/08 | T-Mobile | Direct Debit | $119.63 |
| 8-J at 81, 16-P at 78 | 03/20/08 | T-Mobile | Direct Debit | $71.27 |
| 8-J at 96, 16-P at 77 | 04/25/08 | T-Mobile | Check | $73.04 |
| 8-J at 111, 16-P at 80 | 06/02/08 | T-Mobile | Check | $214.99 |
| | | Total: | | $623.71 |
| | | | | |
| 8-J at 59 | 01/02/08 | Unknown | Check | $612.00 |
| 8-J at 59 | 01/02/08 | Unknown | Check | $500.00 |
| 8-J at 59 | 01/02/08 | Unknown | Check | $544.00 |
| 8-J at 59 | 01/02/08 | Unknown | Check | $1,000.00 |
| 8-J at 59 | 01/02/08 | Unknown | Check | $500.00 |
| 8-J at 59 | 01/03/08 | Unknown | Check | $600.00 |
| 8-J at 59 | 01/03/08 | Unknown | Check | $1,500.00 |
| 8-J at 59 | 01/03/08 | Unknown | Check | $1,000.00 |
| 8-J at 59 | 01/03/08 | Unknown | Check | $500.00 |
| 8-J at 59 | 01/04/08 | Unknown | Check | $549.32 |
| 8-J at 59 | 01/04/08 | Unknown | Check | $628.24 |
| 8-J at 59 | 01/09/08 | Unknown | Check | $241.14 |
| 8-J at 59 | 01/11/08 | Unknown | Check | $20.00 |
| 8-J at 59 | 01/15/08 | Unknown | Check | $500.00 |
| 8-J at 64 | 01/16/08 | Unknown | Check | $300.00 |
| 8-J at 64 | 01/16/08 | Unknown | Check | $500.00 |
| 8-J at 64 | 01/17/08 | Unknown | Check | $60.07 |
| 8-J at 64 | 01/18/08 | Unknown | Check | $19.21 |
| 8-J at 64 | 01/22/08 | Unknown | Check | $500.00 |
| 8-J at 64 | 01/25/08 | Unknown | Check | $16.04 |
| 8-J at 64 | 01/30/08 | Unknown | Check | $4.43 |
| 8-J at 64 | 02/05/08 | Unknown | Check | $1,500.00 |
| 8-J at 64 | 02/05/08 | Unknown | Check | $1,090.00 |
| 8-J at 64 | 02/05/08 | Unknown | Check | $1,090.00 |
| 8-J at 64 | 02/05/08 | Unknown | Check | $1,498.10 |

[*68]

| | | | | |
|---|---|---|---|---|
| 8-J at 64 | 02/06/08 | Unknown | Check | $664.00 |
| 8-J at 64 | 02/06/08 | Unknown | Check | $855.00 |
| 8-J at 64 | 02/11/08 | Unknown | Check | $189.44 |
| 8-J at 64 | 02/11/08 | Unknown | Check | $120.00 |
| 8-J at 64 | 02/12/08 | Unknown | Check | $200.00 |
| 8-J at 64 | 02/12/08 | Unknown | Check | $20.00 |
| 8-J at 64 | 02/14/08 | Unknown | Check | $60.07 |
| 8-J at 64 | 02/15/08 | Unknown | Check | $12.73 |
| 8-J at 73 | 02/19/08 | Unknown | Check | $7.10 |
| 8-J at 73 | 03/03/08 | Unknown | Check | $2,000.00 |
| 8-J at 73 | 03/06/08 | Unknown | Check | $432.99 |
| 8-J at 73 | 03/13/08 | Unknown | Check | $59.27 |
| 8-J at 73 | 03/13/08 | Unknown | Check | $11.68 |
| 8-J at 73 | 03/13/08 | Unknown | Check | $1,500.00 |
| 8-J at 73 | 03/13/08 | Unknown | Check | $1,500.00 |
| 8-J at 73 | 03/14/08 | Unknown | Check | $12.73 |
| 8-J at 81 | 03/24/08 | Unknown | Check | $2,000.00 |
| 8-J at 81 | 03/31/08 | Unknown | Check | $1,000.00 |
| 8-J at 81 | 04/04/08 | Unknown | Check | $230.00 |
| 8-J at 81 | 04/07/08 | Unknown | Check | $72.09 |
| 8-J at 81 | 04/09/08 | Unknown | Check | $14.01 |
| 8-J at 81 | 04/11/08 | Unknown | Check | $63.77 |
| 8-J at 81 | 04/14/08 | Unknown | Check | $12.73 |
| 8-J at 96 | 04/17/08 | Unknown | Check | $500.00 |
| 8-J at 96 | 04/18/08 | Unknown | Check | $50.00 |
| 8-J at 96 | 04/18/08 | Unknown | Check | $2,000.00 |
| 8-J at 96 | 04/25/08 | Unknown | Check | $4,000.00 |
| 8-J at 96 | 04/25/08 | Unknown | Check | $300.00 |
| 8-J at 96 | 04/29/08 | Unknown | Check | $1,400.00 |
| 8-J at 96 | 05/02/08 | Unknown | Check | $1,000.00 |
| 8-J at 96 | 05/08/08 | Unknown | Check | $12.72 |
| 8-J at 111 | 05/19/08 | Unknown | Check | $6.58 |
| 8-J at 111 | 05/22/08 | Unknown | Check | $2,000.00 |
| 8-J at 111 | 05/30/08 | Unknown | Check | $1,450.00 |
| 8-J at 111 | 06/02/08 | Unknown | Check | $71.41 |
| 8-J at 111 | 06/05/08 | Unknown | Check | $6,000.00 |
| 8-J at 111 | 06/20/08 | Unknown | Check | $355.00 |
| 8-J at 128 | 06/23/08 | Unknown | Check | $35.00 |
| 8-J at 128 | 07/09/08 | Unknown | Check | $2,000.00 |
| 8-J at 135 | 07/24/08 | Unknown | Check | $121.91 |
| 8-J at 135 | 07/24/08 | Unknown | Check | $3,820.00 |
| 8-J at 135 | 07/24/08 | Unknown | Check | $2,000.00 |
| 8-J at 135 | 07/30/08 | Unknown | Check | $350.00 |

[*69]

| | | | | |
|---|---|---|---|---|
| 8-J at 135 | 08/01/08 | Unknown | Check | $31.00 |
| 8-J at 135 | 08/05/08 | Unknown | Check | $6.75 |
| 8-J at 135 | 08/11/08 | Unknown | Check | $1,500.00 |
| 8-J at 135 | 08/12/08 | Unknown | Check | $400.00 |
| 8-J at 135 | 08/12/08 | Unknown | Check | $1,479.52 |
| 8-J at 135 | 08/13/08 | Unknown | Check | $350.00 |
| 8-J at 149 | 09/02/08 | Unknown | Check | $1,500.00 |
| 8-J at 149 | 09/03/08 | Unknown | Check | $1,150.00 |
| 8-J at 149 | 09/03/08 | Unknown | Check | $430.00 |
| 8-J at 149 | 09/04/08 | Unknown | Check | $941.82 |
| 8-J at 149 | 09/12/08 | Unknown | Check | $588.72 |
| 8-J at 149 | 09/17/08 | Unknown | Check | $2.83 |
| 8-J at 149 | 09/18/08 | Unknown | Check | $81.75 |
| 8-J at 149 | 09/19/08 | Unknown | Check | $12.00 |
| 8-J at 161 | 11/03/08 | Unknown | Check | $10.89 |
| 8-J at 161 | 11/07/08 | Unknown | Check | $80.00 |
| 8-J at 170 | 11/24/08 | Unknown | Check | $1,704.94 |
| 8-J at 170 | 11/24/08 | Unknown | Check | $1,050.00 |
| 8-J at 169 | 12/04/08 | Unknown | Check | $73.44 |
| 8-J at 169 | 12/05/08 | Unknown | Check | $160.00 |
| 8-J at 169 | 12/12/08 | Unknown | ??? | $5,000.00 |
| 8-J at 169 | 12/15/08 | Unknown | Check | $50.00 |
| 8-J at 184 | 12/24/08 | Unknown | Check | $1,550.00 |
| 8-J at 184 | 12/29/08 | Unknown | Check | $100.00 |
| 8-J at 184 | 12/30/08 | Unknown | Check | $321.66 |
| 8-J at 184 | 12/30/08 | Unknown | Check | $100.00 |
| | | Total: | | $72,458.10 |
| | | | | |
| 8-J at 65, 16-P at 75 | 01/17/08 | Verizon Wireless | Direct Debit | $234.41 |
| 8-J at 97, 16-P at 79 | 05/02/08 | Verizon Wireless | Check | $140.89 |
| 8-J at 161 | 10/24/08 | Verizon Wireless | Direct Debit | $96.83 |
| 8-J at 170 | 12/01/08 | Verizon Wireless | Direct Debit | $93.57 |
| | | Total: | | $565.70 |
| | | | | |
| | | GRAND TOTAL: | | $838,778.24 |

[*70]                           APPENDIX D

<table>
<tr><th colspan="5">Account 5289 Debits By Payee</th></tr>
<tr><th>Record Citation</th><th>Pay Date</th><th>Payee</th><th>Transfer<br><br>Type</th><th>Amount Out</th></tr>
<tr><td>11-J at 242, 12-J at 326</td><td>03/18/08</td><td>Account 0349</td><td>Check</td><td>$5,000.00</td></tr>
<tr><td>11-J at 246, 12-J at 327</td><td>04/03/08</td><td>Account 0349</td><td>Check</td><td>$20,000.00</td></tr>
<tr><td>11-J at 256, 12-J at 328</td><td>05/09/08</td><td>Account 0349</td><td>Check</td><td>$300,000.00</td></tr>
<tr><td>11-J at 305</td><td>12/02/08</td><td>Account 0349</td><td>Wire</td><td>$10,000.00</td></tr>
<tr><td>11-J at 305</td><td>12/08/08</td><td>Account 0349</td><td>Wire</td><td>$10,000.00</td></tr>
<tr><td>11-J at 305</td><td>12/18/08</td><td>Account 0349</td><td>Wire</td><td>$5,000.00</td></tr>
<tr><td></td><td></td><td>Total:</td><td></td><td>$350,000.00</td></tr>
<tr><td></td><td></td><td></td><td></td><td></td></tr>
<tr><td>11-J at 242, 12-J at 323, 16-P at 18</td><td>03/20/08</td><td>Artmonde LLC</td><td>Check</td><td>$100,000.00</td></tr>
<tr><td></td><td></td><td>Total:</td><td></td><td>$100,000.00</td></tr>
<tr><td></td><td></td><td></td><td></td><td></td></tr>
<tr><td>11-J at 256, 12-J at 324</td><td>05/28/08</td><td>Artnouveau</td><td>Check</td><td>$250,000.00</td></tr>
<tr><td></td><td></td><td>Total:</td><td></td><td>$250,000.00</td></tr>
<tr><td></td><td></td><td></td><td></td><td></td></tr>
<tr><td>11-J at 230, 12-J at 310, 16-P at 5</td><td>02/01/08</td><td>Cash</td><td>Check</td><td>$10,000.00</td></tr>
<tr><td>11-J at 230, 12-J at 311, 16-P at 6</td><td>02/01/08</td><td>Cash</td><td>Check</td><td>$20,000.00</td></tr>
<tr><td>11-J at 230, 12-J at 312, 16-P at 7</td><td>02/13/08</td><td>Cash</td><td>Check</td><td>$9,000.00</td></tr>
<tr><td>11-J at 242, 12-J at 322, 16-P at 19</td><td>03/10/08</td><td>Cash for Wire</td><td>Check</td><td>$180,000.00</td></tr>
<tr><td>11-J at 246, 12-J at 314, 16-P at 9</td><td>04/30/08</td><td>Cash</td><td>Check</td><td>$5,000.00</td></tr>
<tr><td>11-J at 285, 12-J at 315, 16-P at 10</td><td>08/11/08</td><td>Cash</td><td>Check</td><td>$8,000.00</td></tr>
<tr><td>11-J at 285, 12-J at 316, 16-P at 11</td><td>08/11/08</td><td>Cash for Wire</td><td>Check</td><td>$26,000.00</td></tr>
<tr><td>11-J at 288, 12-J at 317, 16-P at 12, 23</td><td>09/05/08</td><td>Cash</td><td>W/D</td><td>$6,000.00</td></tr>
<tr><td>11-J at 298, 12-J at 318, 16-P at 13</td><td>10/24/08</td><td>Cash</td><td>W/D</td><td>$8,000.00</td></tr>
<tr><td>11-J at 298, 12-J at 325</td><td>10/24/08</td><td>Cash</td><td>W/D</td><td>$100,000.00</td></tr>
<tr><td></td><td></td><td>Total:</td><td></td><td>$372,000.00</td></tr>
</table>

[*71]

| | | | | |
|---|---|---|---|---|
| 11-J at 230 | 02/08/08 | Chase Auto | Check | $1,977.76 |
| | | Total: | | $1,977.76 |
| | | | | |
| 11-J at 226 | 01/31/08 | Credit Card | Direct Debit | $3,234.36 |
| 11-J at 230, 16-P at 15 | 02/07/08 | Credit Card | Direct Debit | $20,000.00 |
| 11-J at 231 | 02/29/08 | Credit Card | Direct Debit | $10,488.92 |
| 11-J at 242 | 03/21/08 | Credit Card | Direct Debit | $5,423.09 |
| 11-J at 246, 16-P at 16 | 04/22/08 | Credit Card | Direct Debit | $14,000.00 |
| 11-J at 288 | 09/26/08 | Credit Card | Direct Debit | $10,421.47 |
| 11-J at 302 | 11/18/08 | Credit Card | Direct Debit | $10,000.00 |
| 11-J at 305 | 12/04/08 | Credit Card | Direct Debit | $5,000.00 |
| | | Total: | | $78,567.84 |
| | | | | |
| 11-J at 226, 12-J at 309, 16-P at 4 | 01/08/08 | Doo Young Choi | Check | $30,000.00 |
| 11-J at 230, 12-J at 313, 16-P at 8 | 02/20/08 | Doo Young Choi | Check | $85,000.00 |
| | | Total: | | $115,000.00 |
| | | | | |
| 11-J at 302, 12-J at 319, 16-P at 14 | 11/07/08 | Hanmi Bank | Check | $15,000.00 |
| | | Total: | | $15,000.00 |
| | | | | |
| 11-J at 288, 12-J at 331, 16-P at 22, 26 | 09/05/08 | Hyo Sang Kim | Wire | $3,841.33 |
| | | Total: | | $3,841.33 |
| | | | | |
| 11-J at 288, 12-J at 329, 16-P at 22, 24 | 09/05/08 | Kwang Ja Yoo | Wire | $9,518.00 |
| | | Total: | | $9,518.00 |
| | | | | |
| 11-J at 246, 12-J at 320, 16-P at 17 | 04/16/08 | Richard Suh | Check | $5,000.00 |
| | | Total: | | $5,000.00 |
| | | | | |
| 11-J at 230 | 02/05/08 | Unknown | Check | $872.00 |
| 11-J at 230 | 02/05/08 | Unknown | Check | $135.00 |
| 11-J at 230 | 02/07/08 | Unknown | Check | $628.24 |
| 11-J at 230 | 02/07/08 | Unknown | Check | $549.32 |
| | | Total: | | $2,184.56 |

[*72]

| | | | | |
|---|---|---|---|---|
| 11-J at 288, 12-J at 330, 16-P at 22, 25 | 09/05/08 | Young Ran Lee | Wire | $3,618.00 |
| | | Total: | | $3,618.00 |
| | | | | |
| | | GRAND TOTAL: | | $1,306,707.49 |